*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DARA S., | ) | |
| | ) | Supreme Court Nos. S-16126/16526/ |
| Appellant, | ) | 16527 (Consolidated) |
| | ) | |
| v. | ) | Superior Court No. 3AN-13-00386 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | O P I N I O N |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 7288 – September 7, 2018 |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |
| | ) | |
| STATE OF ALASKA, OFFICE OF | ) | |
| PUBLIC ADVOCACY, GUARDIAN | ) | |
| AD LITEM, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DARA S., | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |

DARA S., )
                                  )
          Appellee. )
 )

Appeals from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge, and Pamela Scott Washington, Judge pro tem.

Appearances: Rachel E. Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant/Appellee Dara S. Paul F. McDermott, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Appellant Guardian Ad Litem. Laura Fox, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellant/Appellee Office of Children's Services.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

WINFREE, Justice.
BOLGER, Justice, with whom STOWERS, Chief Justice, joins, dissenting.

## I.    INTRODUCTION

We frequently review parental rights termination decisions. But the appeals before us present not only the review of a termination decision, which we affirm, but also the review of a unique parental rights reinstatement decision. This secondary aspect of our review causes us to revisit and expound on issues arising from *Rita T. v. State*,[1] in which we held that a parent whose parental rights have been terminated retains the right, upon a showing of good cause, to request a review hearing, during which the parent may

---

[1]    623 P.2d 344 (Alaska 1981).

seek to set aside a termination order and have parental rights reinstated.[2] This then leads us to review the superior court's reinstatement order in this case.

As we explain below, *Rita T.* remains viable today. At a *Rita T.* hearing, a termination order can be set aside by clear and convincing evidence that the parent has been sufficiently rehabilitated and is capable of providing the care and guidance that will serve the child's moral, emotional, mental, and physical welfare and that parental rights reinstatement is in the child's best interests. Because the factual findings supporting the parental rights reinstatement in this case are inadequate for our review of the necessary best interests finding, we remand for further proceedings consistent with our opinion.

## II.   FACTS AND PROCEEDINGS

### A.   Termination

#### 1.   Facts

##### a.   Dara and Paxton

Dara S. is the mother of Paxton,[3] who was born in February 2011 with serious kidney problems. Paxton had nine surgeries before the age of two. Dara testified that parenting Paxton during this period, which she did with "very little support,"[4] "was incredibly stressful and heartbreaking." Paxton's health improved while he was in Dara's care; his right kidney function improved from 0% to 30%, delaying surgery to remove it. Although Paxton continues to require a strict diet and frequent medical checkups, and will require a kidney transplant by his teenage years, his health has generally improved.

---

[2]    *Id.* at 347.

[3]    We use pseudonyms to protect the parties' privacy.

[4]    Paxton's father was never involved in Paxton's life and relinquished his parental rights in December 2014; he is not a party to this appeal.

## b. Dara's mental health episodes

In the fall of 2011 Dara sought mental health counseling for depression; she reported having used Zoloft, an anti-depressant that also treats anxiety and other mood disorders,[5] for about eight months. In October she was diagnosed with attention-deficit/hyperactivity disorder (ADHD), depressive disorder not otherwise specified, and post-traumatic stress disorder (provisional). Dara's psychiatrist increased her dosage of Zoloft, and planned to prescribe Adderall, used in treating ADHD.[6] In October 2012 Dara also was directed to begin taking Viibryd, which treats major depressive disorder,[7] and Xanax, for anxiety,[8] while decreasing her Zoloft dosage. Five months later Dara expressed "that her medications weren't working"; she felt her medications were contributing to more aggressive behavior.

In June 2013 Dara and Paxton were taken to the hospital emergency department after she contacted paramedics. Dara told hospital staff she had a "cloudy mind," did not "know if she[] [was] on the right medication," and had been having trouble sleeping for the past three days. Hospital staff noted that Dara was "scared and tearful," saying she needed "to be in a safe place." According to staff, Dara was

---

[5] *See Sertraline (marketed as Zoloft) Information*, DRUG SAFETY AND AVAILABILITY, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/Drugs/ DrugSafety/ ucm053351.htm (last updated July 23, 2015).

[6] *See Adderall and Adderall XR (amphetamines) Information*, DRUG SAFETY AND AVAILABILITY, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/Drugs/ DrugSafety/ucm111441.htm (last updated July 8, 2015).

[7] *See Viibryd label*, U.S. FOOD & DRUG ADMIN., https://www.accessdata. fda.gov/drugsatfda_docs/label/2011/022567s000lbl.pdf (last updated Jan. 2010).

[8] *See XANAX Medication Guide*, U.S. FOOD & DRUG ADMIN., https://www. accessdata.fda.gov/drugsatfda_docs/label/2016/018276s052lbl.pdf#page=24 (last updated Sept. 2016).

"significantly paranoid and delusional"; for example: (1) she asked staff to hide Paxton with a blanket because she was worried a woman who was "impersonating" her would "take" him; (2) she was "freaked out" by "motorcycles honking and circling her apartment complex all day"; (3) she had overheard "a man in the hallway talking about killing her"; (4) she was worried "that her son ha[d] been cut open and some of his organs were" missing; and (5) her thinking was "not linear . . . [,] logical[,] . . . [or] reality based." Dara tested positive for amphetamines, a result explained by her prescribed medications; hospital staff "felt that her impaired cognition [was] substance induced" and that "medication management and further observation" were warranted.

OCS briefly took emergency custody of Paxton during Dara's hospital stay. When Dara later brought Paxton for a medical check up, providers noted that "[Paxton] ha[d] a nice attachment to his mother" and that Dara was "very attentive to [Paxton's] needs."

In September Dara left her mother a voicemail "asking . . . for help." Dara's mother — who lived in Oregon — was concerned because Dara "was very distraught"; she "said that she wasn't able to cope at that moment," that "she had taken some pills," and that she wanted her ashes to be "put . . . in a dumpster." Dara's stepfather called Anchorage 911, and the police and fire departments were "[d]ispatched to [Dara for] a suicide-threats call."

First responders found Dara's apartment clean and well-kept; Paxton was sleeping. Dara was "distraught" and "somewhat uncooperative"; she told responding police officers they would "have to shoot [her] to take [her] to the hospital." She was "more cooperative and less hostile" with the fire department responders, admitting to them "that she had taken 30 pills of Adderall." Both Dara and Paxton were taken to the hospital.

Police officers came to the hospital to remove Paxton for OCS to take emergency custody; Dara tried to fight them, and she ended up in handcuffs. Hospital staff noted Dara was "rambling and not making sense." Initially she was "loud and disruptive" and "very resistant to staying in" the hospital. Dara stayed at the hospital for about 24 hours before being transported to Alaska Psychiatric Institute (API). Before transferring to API, she was diagnosed with psychosis, suicidal gesture, and intentional Adderall drug overdose. API diagnosed Dara with an "[a]mphetamine induced psychotic disorder," and noted it was "resolved." API recommended that she abstain from "addictive prescription medications such as benzodiazepine," an ingredient found in her prescribed antidepressant medications.

During this time, OCS filed a petition for emergency custody of Paxton, which the superior court granted.

### c.    OCS's initial involvement in Alaska

Dara and Paxton's case was assigned to OCS caseworker Michelle Virden after Paxton was taken into emergency custody. After a first telephonic contact, Virden met with Dara following an October 2013 court hearing. Dara said that during her pregnancy with Paxton "she had been raped with shards of glass and sticks," causing his health problems. Dara denied overdosing on Adderall, claiming that the idea she attempted suicide was a fabrication by her mother, and Dara claimed family members had verbally and physically abused her. She blamed her recent "episodes" on pesticides used to treat bed bugs in her apartment. Virden treated Dara's case as a "mental health case"; accordingly, Dara's November case plan included that she: (1) regularly meet with her OCS social worker to identify and meet goals; (2) actively participate with chosen mental health providers and maintain her mental health condition with recommended medication and treatment; (3) manage her anger and emotions with documented progress through counseling services and reports from providers; (4) obtain

employment for six months or more; and (5) set healthy limits and boundaries in personal relationships. As a first step in implementing the case plan, Virden referred Dara to Dr. Michael Rose for a mental health evaluation.

Dr. Rose conducted a psychological evaluation of Dara in November, administering five psychological and substance abuse tests. Dr. Rose diagnosed Dara with psychotic disorder not otherwise specified (NOS), along with neglect of child, history of ADHD, and prior amphetamine and cannabis abuse. He noted that the hospital had diagnosed her with "Amphetamine-Induced Psychotic Disorder," and that because her "problems have persisted, a Psychotic Disorder NOS is given but consideration should be given to a formal thought disorder diagnosis such as Schizophrenia, Paranoid Type." He recommended further assessment, and, concluding that Dara presented a significant risk to abuse or neglect Paxton, recommended against reunification. Dr. Rose recommended that Dara: (1) "work carefully with her psychiatrist and psychotherapist to address her diagnosed problems"; (2) "maintain gainful employment over a sustained period of time and show that she can obtain and maintain housing for herself and [Paxton]"; and (3) obtain "individualized [parenting] education and instruction." In the event Dara struggled to effectively parent or respond to treatment, Dr. Rose suggested developing a legal guardianship for Paxton.

After obtaining Dr. Rose's psychological evaluation, Virden arranged for Dara to obtain mental health services from Anchorage Community Mental Health. Because of its lengthy waiting list, Dara's first appointment was not scheduled until the end of May 2014, six months after Dr. Rose's evaluation. In the meantime Virden helped Dara by providing her bus passes; having a social worker intern, who was working on a mental health master's degree, help her with the issues Dr. Rose's evaluation raised; encouraging her to apply for Supplemental Security Income (SSI);

driving her to sell or return items to save money; supervising visits with Paxton; and setting up extra visits with Paxton.

Before her mental health services appointment, Dara traveled to Santa Cruz, California — where she had grown up — planning to live with a man with whom she had gone to high school. But the relationship did not last and she soon came back to Anchorage, where she obtained a job. Dara then lived with a roommate, whom Virden described as "off" and "a little strange," for a month or two, before moving out and "couch surfing."

In April 2014 Paxton was placed with Dara's sister, Scarlet, in Oregon. Scarlet gave Dara a laptop to Skype with Paxton; they regularly Skyped three times a week, and Scarlet permitted calls between Skype sessions.

Dara did not attend her scheduled mental health services appointment in late May. She instead moved to Wrangell to live with a man she met online. This relationship lasted only about a month, in part because the man was worried that living with Dara would negatively impact his custody of his own three children. In that time Dara became pregnant with his child. Dara accused him of having an affair with Virden, although he and Virden only had spoken once on the telephone. Dara moved out around the end of June; she then stayed with a friend.

### d.     Dara's move to Oregon

OCS pays to "fly families quarterly"; Dara stayed in Wrangell until OCS paid for her travel in July to see Paxton in Oregon, where she decided to stay. She was pregnant, homeless, and "didn't have much money." Virden informed Oregon's child protective services agency, Department of Human Services (DHS), of Dara's arrival, and Dara was able to obtain housing and prenatal care. Dara took a job that she then lost for reasons beyond her control, but by early 2015 she had found stable housing and work.

In September 2014 Dara's Oregon caseworker referred her for an evaluation at the local Center for Family Development. Dara was diagnosed with "Adjustment Disorder With Mixed Anxiety and Depressed Mood." A Global Assessment of Functioning indicated Dara had anxiety to the point of "getting in the way of . . . functioning." The Center recommended she attend weekly therapy sessions for one year, and in October she began seeing counselor Alexa Jefferis for therapy.

Dara also began weekly DHS-supervised one-hour visits with Paxton starting in September. These later turned into two-hour visits, and Dara occasionally accompanied Scarlet and Paxton to his doctor appointments. Dara also attended one or two of Paxton's soccer practices after getting approval from DHS. During these visits there were few, if any, complaints about Dara's behavior; DHS noted that she was receptive to parenting suggestions, rarely canceled appointments, respected her allotted visitation time, and acted appropriately with Paxton. At this time Scarlet was fairly supportive of Dara spending time with Paxton as long as she first received DHS approval.

In October and November Dara met with Dr. David Truhn for "a comprehensive psychological evaluation and parenting assessment." She was administered seven intelligence, psychological, and parenting tests, and Dr. Truhn reviewed her records, including Dr. Rose's previous evaluation.

Dr. Truhn diagnosed Dara with early onset persistent depressive disorder and unspecified anxiety disorder, requiring further evaluation to rule out "unspecified schizophrenia spectrum and other psychotic disorder." Dr. Truhn was confident in the first two diagnoses; "at one point [Dara] bec[ame] so anxious she could not remember where she currently lived." But he was less confident in his third diagnosis; he saw no evidence of psychotic symptoms and recommended further evaluation. Dr. Truhn also noted that Dara's "impulsivity . . . is a significant concern . . . regarding her ability to

engage in more active parenting responsibilities and necessitates that her visitations continue to be supervised." He recommended that Dara: (1) "participate in individual psychotherapy"; (2) "engage in ongoing treatment and evaluation for anxiety"; (3) "participate in medication evaluation for the use of an antidepressant medication to treat anxiety . . . [while] continu[ing] to be evaluated for any symptoms of psychosis and need for an antipsychotic medication"; and (4) "participate in parent training programs."

During Thanksgiving Scarlet allowed Dara to spend about a half hour with Paxton. Dara asked Scarlet if she could see Paxton on Christmas Day. Scarlet indicated that she would discuss it with her husband, but by December 17 she had not responded to Dara. On December 22 Dara spent four hours with Paxton at a DHS Christmas party. After the party Dara repeated her request for time with Paxton on Christmas Day. After Scarlet refused, Dara and Scarlet carried on the disagreement over the telephone and via text, with Dara cursing at Scarlet and Scarlet saying that Dara was not immediate family. Scarlet considered Dara's repeated communications during this time "harassment."

Early in 2015 Dara learned that some of her mail had been sent to her father's house. Scarlet picked up the unopened mail and gave it to Dara. Dara then went to the post office and, apparently at the post office manager's suggestion, filed a police report claiming identity theft. Dara also left Virden a voicemail about the incident saying she felt like she was being stalked. Dara later testified that she "immediately regretted assuming that" her family was stalking her.

### 2.     Proceedings

In December 2014 OCS petitioned to terminate Dara's parental rights, with trial scheduled to begin in March 2015.[9] In February Dara sought a continuance because

---

[9]     Alaska retained jurisdiction as Paxton's home state when the child in need of aid (CINA) proceeding commenced in September 2013. *See S.B. v. State, Dep't of* (continued...)

she was scheduled to give birth by Caesarean surgery, but her request was denied. After Dara gave birth to a daughter, DHS did not believe she had "sufficient safety service providers" to help her care for the infant and did not know whether she lived in "a calm [home] setting"; Dara's daughter was removed from Dara's care and also placed with Scarlet.

### a. Testimony

The termination trial took place over three days in March 2015. Dara participated telephonically from Oregon. OCS's case focused only on Dara's mental illness.[10] The court heard testimony from Dara, four family members, Dara's coworker and friend, Dara's daughter's father, a police officer, three mental healthcare providers, and OCS and DHS caseworkers.

Dara's father, brother, and sister all testified in favor of terminating Dara's parental rights to Paxton. Her father described Dara as "very manipulative" and said "[s]he looks to me like she's become a street person" because of her tattoos and different hair color. But Dara's father had very little interaction with her in the past 20 years, and he had not seen her since she moved to Oregon. Dara's brother also had very limited interaction with Dara in the previous 10 years, but he characterized her as a "free spirit" who lived "a gypsy kind of lifestyle." Scarlet recognized that "[Dara] loves her son very much," but she also testified that Dara's paranoid and nervous actions had "remained pretty steady over the last few years."

---

**9** (...continued)
*Health & Soc. Servs., Div. of Family & Youth Servs.*, 61 P.3d 6, 13 (Alaska 2002).

**10** *See* AS 47.10.011(11) (stating a child may be found in need of aid if "the parent . . . has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury").

Dara's mother, Dara's friend in Oregon, therapist Jefferis, and DHS worker Ryan Clemmons all testified against terminating Dara's parental rights to Paxton. Dara's mother testified that she had no concerns about Dara's ability to parent. Jefferis, who obtained a masters degree in marriage and family therapy in 2012, testified that she observed no indications of psychosis during her sessions with Dara. Jefferis also testified that Dara had been doing well dealing with the stresses related to employment, pregnancy, and child custody issues, and that she needed "at least another six months" of therapy. And although Jefferis had not "observed [Dara] actually parenting," Jefferis had no "major concerns" about Dara's ability to parent. Clemmons, who had supervised visits between Dara and Paxton at DHS, testified that Dara asked for parenting suggestions, always made up canceled appointments, and acted appropriately with Paxton. Dara's friend, who had known Dara since shortly after she moved to Oregon, said that she considered herself part of Dara's "support system" and that she had been impressed with Dara's ability to take care of herself and others. The friend also testified that, "[a]s a mental health worker" who had a grandson "born with multiple heart defects," she thought it was understandable Dara had difficulty taking care of Paxton by herself in Alaska. But in part because Dara had "formed [a] support group" in Oregon, Dara's friend thought Dara could take care of her children.

Dr. Truhn and Virden both expressed concerns at the termination trial about Dara's ability to be a full-time parent. Dr. Truhn explained how his diagnoses for Dara differed from Dr. Rose's; he noted that Dara appeared to have improved since her psychotic episodes, and he attributed many of her behaviors to anxiety and depression rather than psychosis. Dr. Truhn had recommended further evaluation to rule out a psychotic disorder, and he had recommended continued supervised visitations with Paxton because of Dara's impulsivity. Dr. Truhn also testified that if Dara had accused her daughter's father of an affair with Virden it "sound[ed] kind of paranoid" and

indicated that Dara's mental problems could "be more severe than what [he] saw in [his] assessment."

Virden testified in favor of Paxton remaining with Scarlet. Virden relied on DHS reports as she had not seen Dara in person in ten months. Virden believed Dara continued to have unresolved mental health issues and found concerning Dara's repeated denials that she had mental health issues. Because of Dara's mental health issues, Virden testified that Dara was not ready to assume full-time responsibility for Paxton's care.

### b.     Decision[11]

The parties submitted written closing arguments. In June 2015 Superior Court Judge John Suddock made oral findings and terminated Dara's parental rights. (In October Superior Court Judge pro tem Pamela Washington issued a written decision based on Judge Suddock's oral decision.)

Judge Suddock gave Jefferis's testimony little weight, emphasizing that she was a "relatively young practitioner" who "presented as quite protective of her client" and who "viewed the world through rose-colored glasses." He also gave little weight to either Dara's father's or brother's testimony.

---

[11]     Under relevant CINA statutes and rules, parental rights may be terminated at trial only if OCS shows:

(1) by clear and convincing evidence that: (a) the child has been subjected to conduct or conditions enumerated in AS 47.10.011 (CINA Rule 18(c)(1)(A)); (b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent (CINA Rule 18(c)(1)(A)(i) – (ii)); and (c) reasonable efforts have been made to provide family support services designed to prevent the breakup of the family (CINA Rule 18(c)(2)(A)); and

(2) by a preponderance of the evidence that the child's best interests would be served by termination of parental rights (CINA Rule 18(c)(3)).

Judge Suddock looked disfavorably on Dara's decision to move to Wrangell, "a place without the kind of health services that . . . [Paxton], who has profound kidney problems, is going to need." He characterized the move as "[a] totally unplugged, unhinged life move under the circumstances that reflects a delusional or an irrational impulsive thought pattern." He also found it was "symbolic of just terribly depreciated judgment to have a child in custody, to be fighting mental health problems, and to decide that it's a good time to have a child with a stranger." Characterizing Dara's life in the summer of 2013 as "kind of a psychiatric mess at that point," Judge Suddock found Dara "was very unstable in the fall of 2013 and she's gradually gotten better from there." Judge Suddock found Dara was having "serious . . . delusions" during that time period.

Judge Suddock noted that both Scarlet and Virden testified about Dara's lack of awareness of her mental health issues. He noted that to Dara "[t]here always seemed to be some cause, external, that explained everything." He characterized the incidents around the Christmas Day visit and Dara's mail as "[s]ome frankly paranoid style stuff" that occurred relatively recently. He found Dr. Truhn's testimony "a lighter psychiatric diagnosis than Dr. Rose, but . . . it could be mild symptoms of psychosis" that would need to be looked at for another year.

Judge Suddock noted that this was "a difficult and interesting case . . . . with issues of a mentally ill mom who [was] getting better." He found OCS had proved "by clear and convincing evidence that [Paxton] was subjected to conduct that [made] him a child in need of aid. That's because of the severe mental illness." He also found that OCS made reasonable efforts because Dara was not always "fully engaged" in her treatment plans. He found Dara had "not remed[ied] the conduct within a reasonable time" because she "spent essentially the better part of her first year spinning her wheels, not adequately engaging with mental health treatment." He acknowledged Dara's recent

improvements, but concluded that "[i]t appears just overwhelming to me that the clock's run out, that the best interests of [Paxton] are to be parented by [Scarlet]." Given Paxton's age and medical condition, Judge Suddock was unwilling to wait an additional six months to a year to see if Dara's condition improved.

### c. Dara's appeal

Dara appealed Judge Suddock's termination order, arguing that: (1) as of the termination trial Paxton no longer was a child in need of aid due to Dara's mental health issues because she no longer posed a risk of harm to him; (2) OCS failed to make reasonable reunification efforts; and (3) Dara was not afforded reasonable time to remedy the condition causing Paxton to be a child in need of aid.

## B. Reinstatement

### 1. Facts

#### a. Stay of termination order for review hearing

In September 2015, after the June oral termination decision but before the October written termination order, Dara moved for a review hearing. Dara argued that because she had "made significant progress on her case plan and [would] soon be reunited with her daughter, . . . there [was] good cause for the court to order a review hearing . . . so that she [could] show that it is in [Paxton's] best interest to return to her care and custody." Judge Washington, who was covering Judge Suddock's cases, found good cause for a review hearing and stayed the termination order. The parties were granted a continuance for Dr. Erik Sorensen to assess Paxton's attachment to Dara compared with his attachment to Scarlet and her husband, Paxton's functioning and needs, and a potential plan for reunifying Paxton with Dara. Although OCS agreed to facilitate interim visits between Dara and Paxton, no visits occurred.

We then stayed Dara's appeal of the termination order pending the outcome of the review hearing.[12]

### b. Dara's stabilization and custody of her daughter

Dara continued improving after the termination trial. She continued weekly therapy sessions with Jefferis, and since December 2014 had maintained full-time employment with the same employer. By April 2016 Jefferis believed Dara had become "much more grounded and calm," confident, and better at "creating a stable life for herself." Early in 2016 Jefferis changed the frequency of Dara's sessions to only once or twice each month.

In June 2015 Dara met with Dr. Truhn for an updated psychological assessment. Dr. Truhn thought that Dara was "significantly more stable since the previous evaluation," and that she seemed "on track with the projected prognosis . . . from October [2014]." Based on information Dara provided, Dr. Truhn further believed that a plan for reunification with Paxton could be possible "within the next two to three months."

Dara also met with a psychiatric mental health nurse practitioner, Karla Marvich, who was authorized to prescribe psychotropic medication. Dara first met with Marvich in October 2015 and had met three times with her by February 2016. Marvich concluded that Dara did not meet "criteria for any specific diagnosis" and did not need "any medication." Marvich instead thought that the medications Dara was prescribed in the summer of 2013 "were excessive," and the combination of medications "could have caused increased anxiety" and Dara's psychosis.

---

[12] *Dara S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-16126 (Alaska Supreme Court Order, Dec. 11, 2015).

In November 2015, despite Scarlet's opposition, Dara's daughter was returned to Dara's care. Because DHS had no lingering concerns regarding Dara's ability to care for her daughter, it was anticipated that DHS would dismiss that child's case in May 2016.

### c. Dara's deteriorating relationship with Scarlet

Until August 2015 Dara continued visiting with Paxton through DHS, usually during supervised visits with her daughter. DHS social worker Sara Rich provided one-on-one parent coaching for Dara during some visits. And when Paxton was present at these joint visits, Rich "did not have any concerns" about Dara's ability to parent. Rich later characterized Dara's interactions with Paxton as being "[v]ery good interactions, very kind and compassionate," as well as positive and appropriate. For example, Rich observed Paxton once telling Dara that she was "the best" and once saying he wanted to go home with her. Dara responded appropriately in both instances, telling Paxton "he was the best" also and answering his request to go home with her only by saying she knew that and she loved him.

But by then Dara's relationship with Scarlet had deteriorated. After the superior court's oral termination of Dara's parental rights to Paxton, Scarlet left "it up to [Paxton] [to decide] if he wanted to" have visitation with Dara and his sister. According to Scarlet, Paxton went to only a couple of visits thereafter because "he didn't care to go into the visits and see [Dara]." Scarlet did not seem upset by Paxton not wanting to attend visits; she characterized Dara as "a toxic person" and seemed "very upset" when Dara's daughter was returned to Dara's care. Once Dara regained custody of her daughter and DHS no longer assisted in arranging visits, Scarlet never arranged for Paxton and his sister to visit. In March 2016 Dara and Paxton saw each other for the first time in six months at a joint psychological assessment with Dr. Sorenson.

Dr. Sorensen, who had been asked to assess Paxton's attachment to both Dara and Scarlet, reported that "[c]ontinued placement with [Scarlet] appears the safest and most supportive option that would likely meet [Paxton]'s needs over time." Dr. Sorensen noted that Paxton considered Scarlet his mother, that Paxton had no problems living with her, and that she and her husband adequately cared for his medical needs. Dr. Sorenson also noted that Scarlet had little interest in facilitating visits between Dara and Paxton. Dr. Sorenson believed Dara had "made remarkable progress" since the incidents in 2013 and 2014, and she "demonstrated ample skill in engaging her son"; he did not note any concerns about her ability to parent. But Dr. Sorensen emphasized that any change in custody for Paxton would be "likely to [cause] distress" and recommended careful monitoring of his medical condition if a custody change occurred. Dr. Sorenson also was concerned that Paxton's language limitations and "general tendency to answer 'yes' to most questions" might lead to difficulties. Finally, Dr. Sorensen recommended that, if a change in custody were to occur, it take place incrementally with extensive monitoring.

### 2.    Proceedings

### a.    Hearing

A review hearing took place in April and May of 2016. Testimony primarily concerned Dara's recent progress and Paxton's best interests. OCS presented no expert testimony concerning Dara's current mental health, instead relying on Scarlet's testimony that she believed Dara was "not capable" of parenting and was mentally ill. Dara, her mother, and Scarlet all indicated that Dara would see little of Paxton in the current custody situation.

Hearing testimony indicated that any transition would be difficult for Paxton. Scarlet testified it would be "extremely difficult" for Paxton to be removed from her home "to be placed with a family that he doesn't really know anymore."

Dr. Sorensen thought Paxton had "really adapted well into [Scarlet's] family," and although Dr. Sorensen thought Paxton would be able to adapt to a new family situation, "there's no guarantee that [it would] . . . go well and sometimes kids really struggle when they're forced to leave attachment figures." Dr. Sorensen thought a change in custody would be "a highly confusing event for [Paxton] and one that could very well have a lasting effect" because he would have no memory of living with Dara. Dr. Sorensen thought that Paxton would "have a really hard time for quite some time" before being able to verbalize his concerns. Dr. Sorensen "recommended that [Paxton] remain in his current placement . . . indefinitely as a means of maintaining his emotional stability and general safety." Notwithstanding this recommendation, Dr. Sorensen outlined how a reunification could happen to minimize disruption and how it would take at least three to four months. However, he cautioned against removing Paxton from Scarlet's care, stating it would be "a guaranteed loss" for Paxton and "certainly take a toll on him." Dr. Sorenson added: "Whether that [loss] will be made up for through the reconnection with his mother and the connection with his sister, I couldn't . . . say."

### b. Decision

In July 2016 Judge Washington issued a written decision reinstating Dara's parental rights to Paxton. Judge Washington first noted that she had "heard testimony from multiple witnesses, listened to the termination trial and Judge Suddock's decision on the record, and reviewed medical records, including reports from API, Dr. Michael Rose, and Dr. David Truhn as requested by the parties." Judge Washington then outlined relevant facts leading up to termination, including: (1) Dara's psychotic break due to an Adderall overdose in September 2013; (2) Dr. Rose's report and recommendations; (3) Dara's "erratic[]" period of time when she "was in complete denial about her mental illness" and "made some irrational decisions" prior to moving to Oregon; (4) Dr. Truhn's report and recommendations; (5) Dara's starting individual counseling with Jefferis;

(6) Dara's daughter's birth; (7) the termination trial and the court's findings; and (8) the procedural posture of the review hearing.

Judge Washington made 19 factual findings after the review hearing. Notably, she found Dara was "no longer exhibiting delusional or psychotic behaviors," and she was "not taking psychotropic medications and no medication [was] recommended"; Dara had "been successfully parenting [her daughter] since November . . . 2015"; "[t]he hostility [between Dara and Scarlet] [was] great and ha[d] caused a division in the family"; "Dr. Sorensen reported that [Paxton] . . . [was] 'likely' to experience distress if moved"; and "Dr. Sorensen conclude[d] that the safest result with the least amount of risk to [Paxton's] emotional well[-]being would be to keep [Paxton] with [Scarlet]."

Judge Washington then outlined what she considered the applicable law:

> As long as a child remains the ward of the court under AS 47.10.080(f)[13] his or her natural parents are entitled to a review of the order terminating their parental rights upon a showing of good cause for the hearing. Good cause could be established if the parent or parents show that it would be in the best interests of the child to resume living with him or her because he or she has sufficiently rehabilitated him or herself such that he or she can provide proper guidance and care for the child.[14]

---

[13]    *See* AS 47.10.080(f) ("A child found to be a child in need of aid is a ward of the state while committed to the department or the department has the power to supervise the child's actions."). The balance of this statutory provision relates to the right to request a permanency hearing. *Cf.* AS 47.10.080(*l*) (providing standards for permanency plans, hearings, and court findings regarding various permanency matters).

[14]    Judge Washington cited *Rita T. v. State*, 623 P.2d 344, 347 (Alaska 1981), for this legal proposition.

    *Rita T.* was based on an interpretation of former AS 47.10.080(f), which at
(continued...)

The court also listed AS 47.10.011(11)[15] and AS 47.10.088(b)(1)-(5)[16] as bases for its decision.

Judge Washington began by acknowledging Judge Suddock's June 2015 termination findings. But she then stated that "[t]oday, the record presents a new picture of [Dara]. She has clearly overcome the severe mental impairment that set this case in motion nearly three years ago." Judge Washington noted that Dara had "complied with

---

[14]    (...continued)
that time provided for review hearings rather than permanency hearings. *Id.* at 346-47. (This is why the superior court described Dara's hearing as a review hearing or a *Rita T.* hearing.)    Well after our *Rita T.* decision, however, the legislature amended AS 47.10.080(f), and the statute now relates to permanency hearings rather than review hearings. *See* Ch. 99, § 26, SLA 1998. *Compare* former AS 47.10.080(f) (1980), *with* AS 47.10.080(f). We discuss this more fully below.

[15]    Providing for a child in need of aid finding if "the parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury."

[16]    Providing that:

In making a [failure to remedy] determination under . . . this section, the court may consider any fact relating to the best interests of the child, including

(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;

(3) the harm caused to the child;

(4) the likelihood that the harmful conduct will continue; and

(5) the history of conduct by or conditions created by the parent.

all five of Dr. Rose's treatment recommendations." And Judge Washington pointed out that "[n]either OCS nor the guardian ad litem contested [Dara]'s completion of goals set in her case plan and her current stability." Judge Washington determined that Dara had proved, "by clear and convincing evidence, that she has remedied the conduct and conditions in the home that placed [Paxton] at substantial risk of harm."

Judge Washington then found, by clear and convincing evidence, that it was in Paxton's best interests to return to Dara's care because:

> 1) The state favors reuniting children with biological parents. 2) Mental illness alone cannot support termination of parental rights. 3) There was no harm caused to the child and it is unlikely harmful conduct will happen. 4) The child's bond with the biological parent can be restored. 5) The child can be returned to the parent within a reasonable time based on [the] child's age and needs. 6) The parent has put in a great amount of effort to remedy the conduct or conditions in the home.

Judge Washington emphasized a "presumption for keeping families together when the parents have demonstrated that they are capable of meeting the child's needs." She additionally noted that "a parent's mental illness alone may not form the basis of a termination of . . . parental rights"; that "[w]hatever nexus the court found at the time of termination" relating to Dara's mental illness placing Paxton at harm, "it [did] not exist now"; that it was possible to restore Paxton's bond with Dara; and that Dara "ha[d] put in a lot of effort to remedy the conduct and conditions in the home that caused her son to be taken." Judge Washington then ordered OCS to "begin a transition plan" to return full custody of Paxton to Dara.

After OCS moved for reconsideration, in October Judge Washington clarified her previous findings. OCS had argued that Judge Washington created a burden-shifting presumption that reuniting with a biological parent is in a child's best

interests. Judge Washington responded that she instead "simply . . . acknowledg[ed] the legislative preference in favor of keeping a child with his or her biological parents." Judge Washington then noted OCS's renewed arguments — that it was not in Paxton's best interests to return to Dara considering permanency and the length of time necessary for reunification. Judge Washington first rejected any suggestion that she had not taken into account Paxton's age, the length of time he had lived with Scarlet, and his attachment to Scarlet. Judge Washington stated that she also had considered Paxton's prior bond with Dara and his bond with Dara during visitations. And Judge Washington expressly rejected OCS's argument that Dara was a stranger to Paxton.

Although Judge Washington noted that her decision had involved a best interests analysis, she also explained her view that "[o]nce good cause is established for a review hearing, . . . the court is not required to undertake a best interest analysis if circumstances have changed so much that the child is no longer a child in need of aid." Judge Washington indicated that "[a] best interest analysis is only done when it is first determined that the child is in need of aid." She emphasized that in the reinstatement context, "[a] best interest analysis is not necessary to determine *if* a child should return home, but only required to determine *when* a child will return home." (Emphases in original.) Finally, Judge Washington modified her original order to include a future "hearing on the timetable for reunification."

### c.     OCS's and guardian ad litem's appeals

OCS and Paxton's guardian ad litem (GAL) appealed the reinstatement order. Although OCS does not directly challenge *Rita T.*'s holding, it questions that holding's foundation after subsequent statutory changes. OCS asks us to clarify and limit *Rita T.*'s application, primarily arguing that: (1) a *Rita T.* proceeding is not appropriate when a child is in an adoptive placement; (2) it was legal error to apply a presumption in favor of reunification; and (3) it was clear error to find it was in Paxton's

best interests to return to Dara. The GAL joins in OCS's arguments and also argues that a *Rita T.* proceeding is intended only in an extraordinary case when permanency has not been established post-termination.

## III. DISCUSSION

### A. The Termination Of Dara's Parental Rights[17]

Dara argues the superior court erred by finding that: (1) her mental illness led to Paxton being a child in need of aid and that she had not remedied the conduct or conditions initially placing him at risk; (2) OCS made reasonable efforts to reunify her family; and (3) she was afforded reasonable time to remedy. Because Dara's arguments are not convincing, we affirm the superior court's decision terminating her parental rights to Paxton.

#### 1. Child in need of aid finding

Dara makes two separate arguments why the superior court erred by finding Paxton was a child in need of aid. First, Dara argues that the court improperly made its CINA finding "based upon Dara's mental illness alone." Second, Dara argues that the court clearly erred by finding her mental illness continued to pose Paxton "substantial risk of physical harm or mental injury" at the time of trial.

---

[17] In a case involving parental rights termination we review a trial court's findings of fact for clear error. *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003). Findings are clearly erroneous if, after reviewing the entire record in the light most favorable to the prevailing party, we are left with a "definite and firm conviction that a mistake has been made." *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)). "We review de novo whether a trial court's findings satisfy the requirements of the child in need of aid statute." *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010) (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

### a. Child in need of aid finding not based on Dara's mental illness alone

Alaska Statute 47.10.011(11) permits courts to find that a child is in need of aid if "the parent . . . has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury."[18]  Because AS 47.10.011(11) has two requirements — parental mental illness *and* substantial risk of harm to the child — we have repeatedly held that "mental illness alone may not form the basis of a [CINA] finding."[19]

Dara argues that the "court failed to articulate in either its oral or written findings the specific conduct flowing from Dara's mental illness that placed Paxton at risk as required under subsection (11)."  In its oral findings the court stated OCS proved "by clear and convincing evidence that [Paxton] was subjected to conduct that makes him a child in need of aid.  That's because of the severe mental illness."  The court's written findings are similarly succinct:  "There is clear and convincing evidence that the child has been subjected to conduct or conditions described in AS 47.10.011(11).  The court adopts herein the oral record of its findings . . . regarding the underlying bases of these findings in their entirety."

But Dara does not consider the underlying oral findings the superior court made in reaching its decision.  The court made explicit oral findings concerning Dara's September 2013 "suicide attempt [from] overdosing on . . . Adderall"; her May

---

[18]  AS 47.10.011(11).

[19]  *Barbara P.*, 234 P.3d at 1255 (citing *K.N. v. State*, 856 P.2d 468, 475 (Alaska 1993); *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1206 n.22 (Alaska 2002)); *see also Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 618 (Alaska 2007) ("Mental illness, absent related conduct, cannot be a basis for termination of parental rights." (alteration omitted) (quoting *V.S.B.*, 45 P.3d at 1206 n.22)).

2014 "totally unplugged, unhinged life move" to Wrangell "that reflects a delusional or an irrational impulsive thought pattern"; her November 2014 diagnoses by Dr. Truhn of persistent depressive disorder and anxiety disorder; her December 2014 "verbally abusive" and "unrealistic demands" to spend time with Paxton on Christmas, symbolic of her general tendency to make unrealistic demands about visitation; and her January 2015 "paranoid style" "identity theft" allegations relating to her mail.

These underlying factual findings of specific conduct are sufficient to support the superior court's finding that Paxton is a child in need of aid under AS 47.10.011(11), especially given his elevated medical needs. For example, in *Barbara P. v. State, Department of Health & Social Services, Office of Children's Services* we affirmed a termination finding under AS 47.10.011(11) because of evidence that the mother "had attempted suicide when [the child] was one year old"; might "attempt suicide again" "if her depression remain[ed] untreated"; had "a pattern of entering into relationships with abusive men with substance abuse problems"; and had "impact[ed] her ability to safely care for her children" by not treating her depression.[20] We similarly affirmed a termination finding under AS 47.10.011(11) in *Alyssa B. v. State, Department of Health & Social Services, Division of Family & Youth Services* because the superior court adequately linked evidence of the mother's mental illness and other "actual conduct-based problems creating a risk of substantial harm" including a refusal to get psychological treatment.[21]

---

[20] 234 P.3d at 1255-56; *see also id.* at 1255 ("[M]ental health issues had a 'very clear ramification[]' for 'her ability to parent . . .' impacting her 'day-to-day functioning and her judgment.' " (alteration in original)).

[21] 165 P.3d at 618-19.

### b. Substantial risk of physical harm or mental injury at the time of trial finding not clearly erroneous

Dara also argues that the superior court clearly erred by finding that she posed a substantial risk of physical harm or mental injury to Paxton at the time of the termination trial. When reviewing factual findings we "ordinarily will not overturn a trial court's finding based on conflicting evidence,"[22] and will not re-weigh evidence "when the record provides clear support for the trial court's ruling."[23] It "is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[24] In this admittedly close case, the court did not clearly err in its findings; "[m]erely because the superior court reached a different conclusion than [Dara] desired does not constitute legal error."[25] As discussed above, the court identified manifestations of Dara's then-untreated mental illness — including "unhinged" life moves, continued paranoia, and suicidal ideation — that placed Paxton, a child with acute medical needs, at substantial risk of physical harm and mental injury at the time of trial unless Dara's parental rights were terminated. Because the record provides clear support for the superior court's ruling, Dara's argument is unavailing.

### 2. Reasonable efforts finding

Dara argues that the superior court erred by finding OCS made reasonable

---

[22] *Martin N.*, 79 P.3d at 53.

[23] *See D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000); *see also Barbara P.*, 234 P.3d at 1260 ("We . . . believe that the deference accorded to a superior court's factual findings is particularly appropriate in close cases.").

[24] *See In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001) (quoting *Knutson v. Knutson*, 973 P.2d 596, 599-600 (Alaska 1999)).

[25] *See Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 933 (Alaska 2012).

efforts to reunify the family. She disputes the superior court's factual finding that she was uncooperative and unwilling to engage in treatment necessary for reunification. Dara also contends that OCS's "failure to pursue critical mental health services in a prompt fashion," and its reliance on Oregon DHS to connect her with adequate mental health providers, render the superior court's reasonable efforts finding clearly erroneous.

We disagree. Although Dara claims the record shows she was cooperative and willing to engage in treatment, ample evidence presented at the termination trial suggests otherwise. The court considered evidence that Dara did not acknowledge her mental illness; that she missed her mental health and SSI appointments by moving to Wrangell; and that she "spent essentially the better part of her first year spinning her wheels, not adequately engaging with mental health treatment." Given this evidence, the court's finding that Dara was uncooperative with OCS's efforts to engage her in treatment was not clearly erroneous.

Although Dara had to wait six months to begin services at Anchorage Community Mental Health, the existence of a waiting list or delay in the provision of services does not automatically preclude a reasonable or active efforts finding.[26] This is particularly true when, as here, OCS's reasonable efforts were frustrated or limited by

---

[26] *See Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 854, 857 (Alaska 2013) (affirming active efforts finding despite "little success [with obtaining treatment] other than to have [the parent's] name added to months-long waiting lists for several programs"); *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990-91 (Alaska 2002) (holding seven month lapse not fatal to active efforts finding where extensive other efforts were made and parent's evasive, combative conduct made providing further services practically impossible). Because the active efforts requirement is more stringent than reasonable efforts, cases concluding that active efforts were made are relevant in evaluating reasonable efforts. *Kylie L. v. State, Dep't of Health & Soc. Servs, Office of Children's Servs.*, 407 P.3d 442, 448 n.6 (Alaska 2017).

the parent's actions and unwillingness to engage in treatment.[27] We agree with the superior court that OCS's efforts were timely under the circumstances. The OCS caseworker quickly referred Dara for a psychological evaluation by Dr. Rose, referred Dara to a program equipped to address the severity of her mental illness, got her on the program's "significant" waiting list, and made an appointment with the program to provide Dara with resources and information about medication management while she waited for an opening. Moreover, OCS continued to support Dara in finding stability in the interim. Although a waiting list at the suitable program presented unfortunate barriers to immediate treatment, OCS's efforts were on the whole timely and reasonable. The court's finding was not clearly erroneous in this regard.

Finally, we are unpersuaded by Dara's argument that there was a lapse in reasonable efforts when she relocated to Oregon. Dara asserts that "OCS should have exercised oversight designed to ensure the services satisfied OCS, not just Oregon DHS." We note OCS is not required to duplicate the efforts of other service providers.[28] It was not unreasonable for OCS to cede some responsibility to DHS to connect Dara with mental health services when she abruptly left Alaska and relocated to Oregon.[29] And DHS's efforts were successful; after initially taking custody of Dara's infant daughter,

---

[27] *See E.A.*, 46 P.3d at 991 ("We have consistently held that '[a] parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts.' " (alteration in original) (quoting *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 603-04 (Alaska 2001))).

[28] *See Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 555 (Alaska 2017) (observing "[w]e have approved superior courts' consideration of efforts made by outside entities" in active efforts analysis and holding "the rationale extends to services provided by others that OCS should not be required to duplicate").

[29] *See id.* at 556.

it provided assistance that led to her return to Dara's care.

The record nonetheless shows that OCS exercised a reasonable degree of oversight while Dara was in Oregon. OCS communicated Dara's case plan to Oregon DHS, faxed the assessments by Dr. Rose and Dr. Truhn, and received updates regarding Dara's progress. Oregon DHS in turn referred Dara to the Center for Family Development, a program with psychiatrists on staff with whom OCS encouraged Dara to consult. OCS conveyed to Dara and her Oregon providers its concern that she remain compliant with her prescribed psychotropic medication. Dara's Oregon therapist was aware of OCS's recommendation and provided Dara with a list of psychiatrists who would accept her insurance in the area. These facts suggest OCS was involved at every level to ensure Dara's access to adequate mental health treatment while in Oregon.

Moreover, an Oregon DHS representative testified that DHS adopted OCS's case plan and assigned workers to implement it. DHS also spoke with Dara about her previous diagnoses and agreed with OCS that she required a "higher level of care," possibly including medication. DHS's deferential approach, described by the superior court as "Alaska did it, then Oregon should do it, too," further cuts against Dara's argument that OCS did not sufficiently steer the out-of-state agency to provide services designed to satisfy Alaska's reunification requirements. In light of the foregoing, we conclude it was not clearly erroneous for the superior court to find OCS made reasonable efforts even while Dara was in Oregon.

### 3. Reasonable time to remedy finding

Dara argues that the superior court clearly erred by finding she "was given a reasonable time to remedy." Dara contends she was following her case plan, it would take less than a year for her to be ready for reunification, and there was no evidence suggesting Paxton would be harmed by continuing to live with Scarlet during that time.

Alaska Statute 47.10.088(a)(2)(B) allows for termination of parental rights if the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child at substantial risk of physical or mental injury." We have "emphasize[d] that the [legislature] clearly put[] the criteria for 'reasonable time' in terms of the child's needs,"[30] and we have indicated that what constitutes a reasonable time "is likely to be shorter for younger children."[31] Failing to follow a case plan may show that a parent did not remedy the situation,[32] and even "completion of a case plan does not guarantee a finding that [a parent] has remedied [her] conduct."[33]

The superior court did not clearly err in finding that Dara was given a reasonable amount of time to remedy OCS's concerns. Dara's case plan required her to engage fully in mental health treatment, and, contrary to her assertions, she failed to do so. Dara did not follow her case plan when she missed her mental health and SSI appointments in May 2014, and her continued denial of any mental health issues, despite evidence of paranoia and delusion shortly before trial in 2015, demonstrates that she had not remedied her conduct.[34] There was testimony that Dara might be ready for

---

[30]     *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1108 (Alaska 2011).

[31]     *See id.* at 1107.

[32]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 952 (Alaska 2013) ("A failure to comply with a case plan may constitute a failure to remedy." (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008))).

[33]     *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1260 (Alaska 2010) (citing *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002)).

[34]     *See id.*; *Sherman B.*, 310 P.3d at 952.

reunification within six months. But we are unable to say it was clear error for the court to find that six months was an optimistic estimate for full reunification and that waiting six months to another full year was unreasonable from Paxton's perspective, given his young age, acute medical needs, and bond with Scarlet, with whom he had already been living for nearly a year.[35] We conclude the court did not clearly err in finding that OCS had given Dara a reasonable time to remedy between the establishment of her case plan in November 2013 and the termination of her parental rights in June 2015.

### 4. Summary

Because the superior court's findings to which Dara objects are not clearly erroneous, all of the necessary findings for the termination of Dara's parental rights were made by the superior court. We therefore affirm the termination order.

## B. The Reinstatement Of Dara's Parental Rights

Resolving OCS's and the GAL's appeal of the superior court's reinstatement order requires us to confront a number of issues. We first will outline our existing case law giving rise to a parent's right to a conditional post-termination reinstatement hearing. We then will examine relevant statutory changes since our original decision about reinstatement hearings. After explaining why, despite some statutory changes, our existing case law regarding reinstatement of parental rights retains vitality, we will address the appropriate substantive- and evidentiary-proof standards to apply at reinstatement hearings. Finally, we will review the court's decision in this case in light of our holdings along the way.

---

[35]     *See Christina J.*, 254 P.3d at 1107 ( "[T]he statute defines 'reasonable time' not as a specific number of months or by reference to parents' needs, but as 'a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments.' " (quoting AS 47.10.990(28))).

### 1.    *Rita T. v. State* **and subsequent case law**

### a.    *Rita T.*

Our 1981 *Rita T. v. State* decision established a limited opportunity to reinstate parental rights post-termination but pre-adoption.[36] In *Rita T.* the superior court had terminated the mother's parental rights.[37] The mother requested a hearing to review that termination order, which "the superior court denied . . . without explanation."[38] We reversed the superior court's decision, holding that "as long as a child remains the ward of the court . . . natural parents are entitled to a review of the order terminating their parental rights upon a showing of good cause for the hearing."[39]

We began by examining former AS 47.10.080(f), which then, in relevant part, governed periodic superior court review of certain disposition orders relating to children in need of aid:

> A minor found to be . . . a child in need of aid is a ward of the state as long as he is committed to the department (of health and social services) or the department has the power to supervise his actions. The court shall review an order made under . . . (c)(1) or (2) of this section annually, and may review the order more frequently to determine if continued placement, probation, or supervision, as it is being provided, is in the best interest of the minor and the public. The department, the minor, the minor's parents, guardian, or custodian are entitled, when good cause is shown, to a review

---

[36]    623 P.2d 344, 346-47 (Alaska 1981).

[37]    *Id.* at 345 (citing *In re C.L.T.*, 597 P.2d 518 (Alaska 1979)).

[38]    *Id.* at 346.

[39]    *Id.* at 347.

on application.[40]

We explained that "[i]t is clear that [termination] orders . . . are not entitled to automatic review, inasmuch as subsection (f) specifies which orders are entitled to this review and [termination] orders . . . are not included within the list."[41] But we nonetheless held that termination orders conditionally could be reviewed upon request. Our examination of the underlying public policy and purposes of Title 47, the CINA statutes, "convince[d] us" of this result.[42] We held that even termination orders would be subject to review upon request if the "interested party . . . establishes good cause . . . and if the child is still a ward of the court."[43]

---

[40]    *Id.* at 346 (quoting former AS 47.10.080(f) (1980)). The reference to reviews for "an order made under . . . (c)(1) or (c)(2) of this section" referred to orders committing children in need of aid to state custody for appropriate placement ((c)(1)), or to a parent or suitable person under state supervision ((c)(2)). *Id.* at 346 & n.2.

[41]    *Id.* at 346.

[42]    *Id.*

[43]    *Id.* Termination orders were referenced in former AS 47.10.080(c)(3) (1980).

Although not mentioned in *Rita T.*, language in the then-current statute providing continuing court jurisdiction over a child in need of aid was consistent with our view of review hearings under former AS 47.10.080(f):

> (a) The court retains jurisdiction over the case *and may at any time stay execution, modify, set aside, revoke, or enlarge a judgment or order, or grant a new hearing, in the exercise of its power of protection over the minor and for his best interest*, for a period of time not to exceed two years or in any event extend past the day the minor becomes 19, unless sooner discharged by the court, except that the department may apply for and the court may grant an

(continued...)

Our public policy and purpose discussion derived from former AS 47.05.060:

> The purpose of this title as it relates to children is to secure for each child the care and guidance, preferably in his own home, that will serve the moral, emotional, mental, and physical welfare of the child and the best interests of the community; to preserve and strengthen the child's family ties whenever possible, removing him from the custody of his parents only as a last resort when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal; and, when the child is removed from his family, to secure for him adequate custody and care.[44]

We then explained:

> We believe that an interpretation of [former AS 47.10.080](f) which permits the review of an order that terminates parental rights is most consonant with these purposes because it provides an opportunity for the child to

---

**43** (...continued)
additional one-year period of supervision past age 19 if continued supervision is in the best interests of the person and the person consents to it. *An application for any of these purposes may be made by the parent, guardian, or custodian acting in behalf of the minor, or the court may, on its own motion, and after reasonable notice to interested parties and the appropriate department, take action which it considers appropriate*.

> (b) *If the court determines at a rehearing that it is for the best interests of the minor to be released to the care or custody of the minor's parent, guardian, or custodian, it may enter an order to that effect and the minor is discharged from the control of the department.*

Former AS 47.10.100(a)-(b) (1977) (emphasis added).

**44** *Rita T.*, 623 P.2d at 346 (quoting former AS 47.05.060 (1980)).

resume living with his or her parents when the parents become capable of providing "adequate custody and care" for the child. While it may not be true of all, some parents are capable of changing and overcoming the problems that caused the termination of their parental rights. For those who can now provide the care and guidance "that will serve the moral, emotional, mental and physical welfare of the child," good cause exists for reviewing the order that terminated their parental rights. Many children who become wards of the court when their parents' rights are terminated are not adopted and they therefore remain wards of the court throughout their minority. Permitting a renewal of the relationship between the child and his parents if the child is still a ward of the court and the parents have undergone a substantial rehabilitation fulfills the purposes of [T]itle 47 as much, if not more, than permitting the child to spend his or her entire minority in a succession of foster homes.[45]

We clarified that this holding "[did] not conflict" with the statutory requirement to "attempt to find a permanent placement for the child when the parental rights of his natural parents have been terminated."[46] And we stated that "[o]nce the child has been adopted, he or she is no longer a ward of the court and the natural parents cannot seek review of the order that terminated their parental rights."[47]

We "conclude[d] that as long as the child remains the ward of the court, under [former] AS 47.10.080(f) his or her natural parents are entitled to a review of the order terminating their parental rights upon a showing of good cause for the hearing."[48] We noted that "[g]ood cause could be established if the parents showed that it would be

---

[45]    *Id.* at 347 (citation omitted) (quoting former AS 47.05.060).

[46]    *Id.* (citing former AS 47.10.080(c)(3)).

[47]    *Id.*

[48]    *Id.*

in the best interests of the child to resume living with them because they have sufficiently rehabilitated themselves so that they can provide proper guidance and care for the child."[49] Turning to the facts of *Rita T.*, we held that the mother had made "a sufficient showing of good cause to entitle her to a review of the order terminating her parental rights if [her child] ha[d] not yet been adopted."[50]

### b. *Nada A.*

In *Nada A. v. State* we considered the State's argument that allowing a *Rita T.* review violates a minor's equal protection rights.[51] The superior court had terminated a mother's parental rights, but it also had ordered that, in the event of changed circumstances, the mother could seek reconsideration of the termination any time before the child was adopted.[52] The mother appealed the termination order, and the State cross-appealed the order allowing the mother to seek reconsideration of the termination order.[53]

The State based its equal protection argument on a claim that children have constitutional rights to permanent, adequate homes, and that allowing some children's

---

[49]     *Id.*

[50]     *Id.* We expressly noted that when the mother in *Rita T.* had applied for her review hearing, adoption proceedings already had commenced. *Id.* at 347 n.6. We stated that if a final adoption decree already had been entered by the time of our decision, the review hearing request should be denied. *Id.* But in a later case we stated, without citation, that in *Rita T.* we interpreted former AS 47.10.080(f) to permit "any natural parent to stay adoption proceedings upon a showing of good cause." *Nada A. v. State*, 660 P.2d 436, 441 (Alaska 1983), *superseded by statute on other grounds*, Ch. 99, §§ 1, 18, SLA 1998, *as recognized in David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 776 & n.20 (Alaska 2012).

[51]     660 P.2d at 441.

[52]     *Id.* at 437.

[53]     *Id.* at 437, 441.

parents to seek review of their termination orders, but not others, leads to disparate treatment of children in this context.[54] Asserting "that the issuance of a termination order [should] overcome[] the statutory presumption in favor of a natural parent's fitness," the State asked us to overrule or modify *Rita T.* because it "undermines finality by resurrecting this preference."[55] The State proposed that courts consider "the best interests of the child (as determined in a neutral adoption process), rather than parental rehabilitation alone."[56]

We stated we would adhere to *Rita T.*'s "good cause" formulation[57] and rejected the State's finality and equal protection arguments, explaining:

> Termination of parental rights is a drastic measure resulting in severance of all legal ties between the child and parent. The revocability of termination orders up until the time of adoption is a necessary compromise between the desire for finality and the desire to avoid unnecessary interference by the state in the natural parent-child relationship. *Rita T.* recognizes, and seeks to accommodate, the inherent potential for fallibility in judicial determinations based upon predictions of human behavior with respect to the likelihood of continued parental misconduct. The subsequent review of termination orders permitted by that decision cannot be said to deny equal protection to . . . other children similarly situated who are awaiting adoption.[58]

---

[54]   *Id.* at 441 n.5.

[55]   *Id.* at 441.

[56]   *Id.*

[57]   *Id.*

[58]   *Id.*

### c.    *Alden H.*

Over two decades later we assumed without deciding that a father who had voluntarily relinquished his parental rights could seek a *Rita T.* hearing, and we then decided the superior court had not abused its discretion by determining the father had failed to show good cause for a hearing.[59] We first noted OCS's misplaced "concern that *Rita T.* reflects an anachronistic emphasis on family reunification."[60] We explained that "*Rita T.* does not privilege a parent's desire to regain custody over the best interests of the child" because "a *Rita T.* hearing requires a parent to show *both* that she is rehabilitated *and* that she is currently capable of providing 'the care and guidance "that will serve the moral, emotional, mental and physical welfare of the child." ' "[61]

We then made clear that "it is not only appropriate but necessary for a court to consider the needs of the child who is the subject of a *Rita T.* motion."[62] The needs of the child play a determinative role in whether a putatively rehabilitated parent can "provide the care and guidance 'that will serve the moral, emotional, mental[,] and physical welfare of the child,' " i.e., whether there is good cause for a *Rita T.* hearing.[63] In light of the weak evidence of the father's rehabilitation, the child's special needs, and the father's failure to demonstrate a capability of providing for those needs, we affirmed

---

[59]    *Alden H. v. State, Office of Children's Servs.*, 108 P.3d 224, 231 (Alaska 2005).

[60]    *Id.* at 231 n.21.

[61]    *Id.* (emphasis added) (quoting *Rita T. v. State*, 623 P.2d 344, 347 (Alaska 1981)).

[62]    *Id.* at 232.

[63]    *Id.* (quoting *Rita T.*, 623 P.2d at 347 (quoting AS 47.05.060)).

the superior court's denial of a *Rita T.* hearing.[64]

### 2.    Post-*Rita T.* statute changes

Alaska Statute 47.10.080(f) was amended in 1998,[65] replacing references to review hearings with references to permanency hearings required after a child has been in state custody for a certain time.[66] This change seems to have been prompted by

---

[64]    *Id.* at 233.

[65]    Ch. 99, § 26, SLA 1998.

[66]    See AS 47.10.080(f):

> A child found to be a child in need of aid is a ward of the state while committed to the department or the department has the power to supervise the child's actions.  For an order made under (c)(1) of this section, the court shall hold a permanency hearing as required by (*l*) of this section and at least annually thereafter during the continuation of foster care to determine if continued placement, as it is being provided, is in the best interest of the child.  The department, the child, and the child's parents, guardian, and guardian ad litem are entitled, when good cause is shown, to a permanency hearing on application. . . . After the permanency hearing, the court shall make the written findings that are required under (*l*) of this section.  The court shall review an order made under (c)(2) of this section at least annually to determine if continued supervision, as it is being provided, is in the best interest of the child; this review is not considered to be a permanency hearing and is not governed by the provisions of this subsection that relate to permanency hearings.

*See also* 47.10.080(*l*) (providing that a permanency hearing shall be held "[w]ithin 12 months after the date a child enters foster care"); 47.10.088(f) (defining entry into foster care on earlier of (1) date of first judicial filing of child abuse or neglect or (2) 60 days after removal of child from child's home).

The reference in AS 47.10.080(f) to permanency hearings for "an order
(continued...)

a then-new federal requirement that permanency hearings — designed to reach decisions regarding permanent placements of children in need of aid[67] — be held at least every 12 months for a child in state custody.[68]

The significant change driven by the statutory amendment is reflected by the subsequent change in our Child In Need of Aid rules. Prior to the amendment, the relevant rule provided for annual reviews of disposition orders — with or without a hearing — and required findings focused on why the child was removed from the home, what efforts had been made to facilitate the child's return to the home, and when the child was expected to return to the home.[69] After the amendment, the rules provided for both annual reviews of disposition orders releasing a child to a parent or suitable person under state supervision,[70] and, for a child in state custody, permanency hearings evaluating the appropriateness of the child's foster placement and establishing

---

[66]    (...continued)
made under (c)(1) of this section" continues to refer to an order committing a child in need of aid to state custody for appropriate placement. AS 47.10.080(c)(1). The reference to "an order made under (c)(2) of this section" continues to refer to an order releasing a child in need of aid to a parent or suitable person under state supervision. AS 47.10.080(c)(2). (Recall that *Rita T.* had interpreted former AS 47.10.080(f) to implicitly provide potential review hearings of termination orders under former AS 47.10.080(c)(3). *Rita T.*, 623 P.2d at 347.)

[67]    *See* AS 47.10.990(27) (defining "permanency hearing" as designed for this purpose); CINA Rule 17.2(a) (stating purpose of hearing is "to establish a permanency plan for each child committed to state custody").

[68]    *See* Adoption & Safe Families Act of 1997, 42 U.S.C. § 675(5)(c) (2012).

[69]    *See* former CINA Rule 19 (1987).

[70]    CINA Rule 19 *amended by* Alaska Supreme Court Order No. 1355 (July 15, 1999) (providing reviews for children under state supervision pursuant to (c)(2) orders); *see also* Ch. 99, § 75, SLA 1998.

permanency plans for the child.[71]

In 2005 the legislature enacted AS 47.10.089, regarding the voluntary relinquishment of parental rights.[72] Subsection (h) provides a *Rita T.*-like review hearing for a parent voluntarily relinquishing parental rights, and it sets out the required evidentiary and substantive standards for setting aside a subsequent termination order:

> After a termination order is entered and before the entry of an adoption or legal guardianship decree, a person who voluntarily relinquished parental rights to a child under this section may request a review hearing, upon a showing of good cause, to vacate the termination order and reinstate parental rights relating to that child. A court shall vacate a termination order if the person shows, by clear and convincing evidence, that reinstatement of parental rights is in the best interest of the child and that the person is rehabilitated and capable of providing the care and guidance that will serve the moral, emotional, mental, and physical welfare of the child.[73]

Alaska Statute 47.10.089(h) was enacted during the legislative session when our *Alden H.* decision was issued and we noted that it was an open question whether a parent who voluntarily relinquished parental rights was entitled to request a *Rita T.* review hearing.[74]

---

[71]    CINA Rule 17.2 *enacted by* Alaska Supreme Court Order No. 1355 (July 15, 1999).

[72]    Ch. 64, § 17, SLA 2005.

[73]    AS 47.10.089(h).

[74]    *See Alden H. v. State, Office of Children's Servs.*, 108 P.3d 224, 231 (Alaska 2005) (noting in March 2005 "[w]e have never decided whether the right announced in *Rita T.* is available to parents who voluntarily relinquish their parental rights . . . and we need not address this issue here"); Ch. 64, § 17, SLA 2005 (effective

(continued...)

Finally, in 2012 the legislature added a statutory presumption, found at AS 47.10.080(w), regarding sibling relationships: "The court shall recognize a presumption that maintenance of a sibling relationship, including with a sibling who is related by blood, marriage, or adoption through one parent, is in a child's best interest."[75]

### 3. *Rita T.*'s continued validity

At oral argument before us, OCS represented that it has agreed to reinstatement of parental rights in some cases after those rights have been terminated, and that reinstatement of parental rights sometimes can be in the best interests of a child in OCS custody. OCS, joined by the GAL, nonetheless in its briefing attacked *Rita T.*'s statutory underpinning, arguing that "[a]ssuming *Rita T.* remains viable," we should preclude its applicability when a child is in an adoptive placement. The GAL drew the line on *Rita T.*'s possible application at what it described as permanent placement rather than adoptive placement.

In their briefing to us, neither OCS nor the GAL sought outright reversal of *Rita T.*, and they did not argue that *Rita T.* was wrong when initially decided. Put more directly, they did not argue that it was originally wrong to interpret former AS 47.10.080(f) to allow a parent the right to request that the court review an AS 47.10.080(c)(3) termination order and consider reinstatement of parental rights. OCS's focus instead is on the legislative change to AS 47.10.080(f) — the original statutory underpinning for *Rita T.* — which eliminated "review hearings" and instituted

---

[74]  (...continued)
June 30, 2005).

[75]  *See* Ch. 59, § 4, SLA 2012 (establishing the new presumption).

"permanency hearings."[76]

OCS argues that permanency hearings are held for all children in state custody and do not involve reconsidering finalized termination orders. OCS also argues that permanency hearings do not involve parents whose parental rights have been terminated because they no longer are "parents" under our court rules.[77] OCS finally argues that if *Rita T.* remains viable based on the modified version of AS 47.10.080(f), then courts handling permanency hearings for children whose parents have had their parental rights terminated must consider reinstatement at every one of those hearings. OCS protests too much.

The modification to AS 47.10.080(f) regarding permanency hearings did not create the sudden statutory void advanced by OCS. Under the modified provision courts must at some point hold permanency hearings regarding AS 47.10.08(c)(1) disposition orders,[78] just like courts previously were required to conduct reviews of those disposition orders.[79] Parents can apply, with good cause shown, for permanency hearings regarding those disposition orders,[80] just like parents previously were able to

---

[76]    *See infra* notes 78, 79, 80, 81 and accompanying text.

[77]    In 1999 we amended the definition of "parent" in our Child In Need of Aid Rules of Procedure to mean "a biological or adoptive parent whose parental rights have not been terminated." CINA Rule 2(k) *amended by* Alaska Supreme Court Order No. 1355 (July 15, 1999).

[78]    *See* AS 47.10.080(f), (*l*).

[79]    *See* former AS 47.10.080(f) (1980) ("The court shall review an order made under . . . (c)(1) or (2) of this section annually . . . .").

[80]    *See* AS 47.10.080(f) ("The department, the child, and the child's parents . . . are entitled, when good cause is shown, to a permanency hearing on application.").

request reviews of those disposition orders.[81] Continued reliance on AS 47.10.080(f) for the right of parents to apply for hearings regarding termination orders — just as parents could previously ask for hearings regarding termination orders under AS 47.10.080(c)(3) — fits just as well, if not better, with the label "permanency hearing" as it does with the label "review hearing."

The focus of a permanency hearing is a permanency plan for a child,[82] and the focus of *Rita T.* is a pathway to permanency for a child through possible reinstatement of parental rights and return of the child to the parent. If — as OCS represented at oral argument — OCS actively works with some parents to have their parental rights reinstated, it presumably is in the context of post-termination permanency plans or hearings.[83] Because Paxton is in a foster care placement, we know this case involves that context.[84] A *Rita T.* hearing request therefore generally should arise only when a parent and OCS engage in post-termination permanency discussions and OCS, in its discretion, rejects the parent's proposal for reinstatement of parental rights. And

---

[81] *See* former AS 47.10.080(f) (1980) ("The department, the minor, [and] the minor's parents . . . are entitled, when good cause is shown, to a review on application.").

[82] *See* CINA Rule 17.2(a).

[83] *See* AS 47.10.080; CINA Rule 17.2.

[84] *See* AS 47.10.088(f) (providing "[a] child is considered to have entered foster care" upon the earlier of "the date of the first judicial finding of child abuse or neglect" or "60 days after the date of removal of the child from the child's home"). We note that foster care placement generally implies that the child is temporarily in a "home with a person or persons who provide parental care for the child," as Paxton is here. *See Foster-Care Placement*, BLACK'S LAW DICTIONARY (10th ed. 2014); AS 47.10.990(25) (defining "out-of-home care provider" as "a foster parent or relative other than a parent with whom the child is placed"). Although we use the term "foster care placement," we wish to clarify this holding applies to children in out-of-home placements more broadly.

a *Rita T.* hearing, then, essentially would focus on a contested permanency plan.[85] Absent a *Rita T.* hearing, the reinstatement decision would be left entirely to OCS's discretion. This certainly would be inconsistent with the legislature's creation of a *Rita T.*-like process for parents who voluntarily relinquish their parental rights and later seek to set aside the termination of their parental rights.[86] And it would be ironic if, after the legislature apparently enacted AS 47.10.089(h) to ensure *Rita T.* parity for parents whose parental rights are voluntarily and involuntarily terminated, an actual disparity arose because the legislature eliminated the *Rita T.* process for those parents whose rights are involuntarily terminated when it amended AS 47.10.080(f), even though OCS concedes there is no clear reason to believe the legislature intended such action.

We emphasize that maintaining parents' rights to ask for *Rita T.* hearings does not mean that courts must, on their own, consider reinstatement at every permanency hearing involving children whose parents have had their parental rights terminated.[87] *Rita T.* did not in any way direct or otherwise suggest that courts had to

---

[85] We wish to make clear that we are not suggesting parents whose parental rights have been terminated necessarily are, in the normal course, parties to permanency plans and hearings. The context of our discussion must be understood to involve parents whose parental rights have been terminated but who have reappeared for the purpose of seeking relief.

[86] *See* AS 47.10.089(h) ("[A] person who voluntarily relinquished parental rights to a child under this section may request a review hearing, upon a showing of good cause, to vacate the termination order and reinstate parental rights . . . .").

[87] OCS's reliance on our court rule defining "parent" as a parent whose parental rights have not been terminated cannot help OCS in this context. Our rules are procedural; they do not override statutes. For example, under AS 47.10.080(i) "the child's parents" may appeal from an order terminating their parental rights:

A child or the child's parents, guardian, or guardian ad litem,

(continued...)

consider reviewing termination decisions absent a request by a parent.[88]  Nor do we

direct or suggest such a thing today.

We reiterate that, although it was not mentioned in our *Rita T.* decision and

the parties do not discuss it in their briefing, AS 47.10.100(a) continues seemingly to

provide express statutory authority for the superior court to stay, grant a new hearing, or

set aside a parental rights termination judgment, upon a parent's application:

> The court retains jurisdiction over the case *and may at any
> time stay execution, modify, set aside, revoke, or enlarge a
> judgment or order, or grant a new hearing, in the exercise of
> its power of protection over the child and for the child's best
> interest . . . .  An application for any of these purposes may
> be made by the parent*, guardian, or custodian acting in behalf
> of the child, or the court may, on its own motion, and after
> reasonable notice to interested parties and the appropriate
> department, take action that it considers appropriate.
> (Emphasis added.)

With this authority, we can think of no better overall context for reevaluating a

termination decision and considering reinstatement of parental rights than a permanency

hearing.

---

[87]     (...continued)
          or attorney, acting on the child's behalf, or the department
          may appeal a judgment or order, or the stay, modification,
          setting aside, revocation, or enlargement of a judgment or
          order issued by the court under this chapter.

 If our court rules overrode this statutory directive regarding who can appeal from court
orders, then Dara had no right to appeal the order terminating her parental rights.  OCS's
argument has no merit.

[88]     *See* 623 P.2d 344, 346 (Alaska 1981) (distinguishing between orders
entitled to automatic review and orders reviewed upon application).

We finally note that the relevant *Rita T.* public policy — that of preferably maintaining children in their homes and strengthening family ties whenever possible[89] — has not gone away in the intervening years. In 1990 the legislature modified AS 47.05.060, but it maintained the statutory purpose of securing "for each child the care and guidance, preferably in the child's own home, that will serve" the child's welfare and the community's best interests.[90] The legislature also maintained the statutory purpose of preserving and strengthening family ties, although it expressly conditioned that upon the child's best interests, as follows: "unless efforts to preserve and strengthen the ties are likely to result in physical or emotional damage to the child."[91] The legislature in 1998 added a specific best interests consideration — "the potential harm to the child caused by removal of the child from the home and family environment" — in disposition orders under AS 47.10.080(c).[92] And in 2005 the legislature modified AS 47.10.005, in relevant part, to clarify that statutes in AS 47.10 — the CINA statutes — "shall be liberally construed" so a child in need of aid may receive the care, guidance, treatment, and control promoting "the child's welfare *and the parents' participation* in the upbringing of the child to the fullest extent consistent with the child's best interests."[93] In sum, *although now expressly subject to the child's best interests*, the legislature's preference for parental participation in the upbringing of their children in the home has not wavered.

---

[89] *See id.* (quoting former AS 47.05.060 (1980)).

[90] Ch. 29, § 2, SLA 1990; *see also* AS 47.05.060 (1990).

[91] Ch. 29, § 2, SLA 1990; *see also* AS 47.05.060 (1990).

[92] Ch. 99, § 31, SLA 1998; *see also* AS 47.10.082(3).

[93] Ch. 64, § 6, SLA 2005 (emphasis added).

With the foregoing in mind, what of OCS's putative challenge to the continuing vitality of *Rita T.*? We could start and stop with the obvious point that OCS did not ask us to overrule *Rita T.* OCS's primary concern seems to be that because we have not had occasion to address the substance of a *Rita T.* hearing and neither a "review" under former AS 47.10.080(f) nor a "permanency hearing" under current AS 47.10.080(f) contemplates the substance of a *Rita T.* hearing, it is unclear when and how *Rita T.* should apply. OCS's concern is real, and we will address it below. But that concern is untethered to the continuing vitality of *Rita T.*

We reject OCS's suggestion that there is no statutory underpinning for a *Rita T.* hearing. OCS does not challenge *Rita T.*'s original premise that former AS 47.10.080(f) implicitly provided a parent the right to seek review of a parental rights termination order under AS 47.10.080(c)(3). OCS's primary argument, that the statutory change from "reviews" to "permanency hearings" eviscerates our interpretation of AS 47.10.080(f), is unpersuasive. And AS 47.10.100(a) provides an express grant of authority to the court to stay, grant a new hearing, modify, or set aside any order or judgment entered in a CINA matter — upon application by, among others, a parent — which does not exclude termination orders. A *Rita T.* hearing fits comfortably within the statutory framework of AS 47.10.100(a) and AS 47.10.080(f). This conclusion remains true to the public policy articulated in *Rita T.* and the legislative purpose of the Title 47 statutes regarding children. If it might ultimately be in a child's best interests to be with parents in the family home — assuming the parents are fit parents and not a danger to the child — then the CINA statutes should be liberally construed to provide an opportunity for parents to demonstrate everything necessary to set aside a prior termination of parental rights and to obtain reinstatement of those rights.

Having concluded that the *Rita T.* hearing process remains viable, we next confront the GAL's and OCS's arguments that a parent should not be allowed to apply

for a *Rita T.* hearing if a child is in a "permanent" placement, a "pre-adoptive placement," or an "adoptive placement." The fundamental flaw in those arguments is that those placements are simply foster placements with descriptive labels apparently intended to convey meanings beyond foster placements. Neither OCS nor the GAL supplies statutory or other definitions suggesting otherwise. We find it only logical that a child is in foster care placement until adoption, or perhaps legal guardianship, is completed and permanency is actually achieved. Defining some attempted out-of-home placements as "permanent," "pre-adoptive," or "adoptive" would render the definition of true permanency meaningless, and the GAL's and OCS's arguments are better suited to the best interests analysis, discussed below. Consistent with the legislature's view when it enacted its *Rita T.*-like provision for parents who had executed voluntary relinquishments,[94] we believe that actual adoption or legal guardianship is the correct place to draw the line.

The more difficult, and more practical, problem arises when a parent seeks to stay an adoption pending *Rita T.* proceedings. We leave this issue to the capable hands of our superior court judges. Such a judge generally will: (1) have presided over the termination trial and be familiar with the family and all of the relevant child in need of aid issues, past and present; (2) have participated in post-termination permanency planning for the child; (3) be in a position to determine whether adoption or other appropriate permanent placement actually is close to fruition; and (4) be in a position to determine whether a stay in adoption or legal guardianship is in the child's best interests pending a *Rita T.* hearing. Rigid rules from our court would be no substitute for the appropriate exercise of discretion by the superior court in the child's best interests.

---

[94] *See* AS 47.10.089(h) (allowing request for review hearing "before the entry of an adoption or legal guardianship decree").

### 4. The substantive and evidentiary standards for granting a *Rita T.* hearing and for reinstating parental rights

OCS is correct that we have not had occasion to define the contours of the *Rita T.* process or expound upon what must be proved — or at what evidentiary level — to obtain reinstatement of parental rights. *Rita T.* and *Nada A.* at best stand for the proposition that a parent's "good cause" showing for a *Rita T.* hearing is sufficient rehabilitation from the factors that led to the termination of parental rights in the first place.[95] Not until *Alden H.* did we make clear that a child's needs play a part in this consideration, stating that at an actual *Rita T.* hearing "a parent [would have] to show *both* that she is rehabilitated *and* that she is currently capable of providing 'the care and guidance "that will serve the moral, emotional, mental and physical welfare of the child." ' "[96] And we concluded that it is "not only appropriate but necessary" to consider the needs of a child for a *Rita T.* hearing request.[97]

We have never had occasion to consider what must be proved at a *Rita T.* hearing or the evidentiary standard of proof required. But as we have discussed, in 2005 the legislature created an express statutory provision for a *Rita T.*-like hearing for parents who voluntarily relinquish their parental rights,[98] and there the legislature expressed both the necessary substantive and evidentiary standards:

> After a termination order is entered and before the entry of an adoption or legal guardianship decree, a person who

---

[95]     *See Rita T. v. State*, 623 P.2d 344, 347 (Alaska 1981); *Nada A. v. State*, 660 P.2d 436, 441 (Alaska 1983).

[96]     *Alden H. v. State, Office of Children's Servs.*, 108 P.3d 224, 231 n.21 (Alaska 2005) (emphasis added) (quoting *Rita T.*, 623 P.2d at 347).

[97]     *Id.* at 232.

[98]     Ch. 64, § 17, SLA 2005.

voluntarily relinquished parental rights to a child under this section may request a review hearing, upon a showing of good cause, to vacate the termination order and reinstate parental rights relating to that child. *A court shall vacate a termination order if the person shows, by clear and convincing evidence, that reinstatement of parental rights is in the best interest of the child and that the person is rehabilitated and capable of providing the care and guidance that will serve the moral, emotional, mental, and physical welfare of the child.*[99]

We believe the legislature's approach to vacating termination orders under AS 47.10.089(h) reflects its continued statutory emphasis on children's best interests and articulates appropriate substantive and evidentiary standards of proof for reinstatement of parental rights. We therefore adopt these standards for a *Rita T.* hearing.[100]

> ### 5.     Remand for clarifying findings regarding Paxton's best interests

Because OCS did not really challenge either Dara's rehabilitated status or that she was capable of caring for Paxton, the superior court's decision to set aside the termination order and reinstate Dara's parental rights was based on its view that Dara

---

[99]     AS 47.10.089(h) (emphasis added).

[100]     In *Lara S.* v. *State, Department of Health & Social Services, Office of Children's Services*, 209 P.3d 120, 121-22 (Alaska 2009) we considered whether a parent who had voluntarily relinquished her parental rights submitted an affidavit sufficient to entitle her to a hearing on reinstatement under the statute. We interpreted AS 47.10.089(h) and held that to demonstrate "good cause" for such a hearing, "a person must make a prima facie showing that:  (1) it is in the child's best interest that the person's parental rights be reinstated, (2) the person is rehabilitated, and (3) the person is capable of caring for the child's moral, emotional, mental, and physical welfare." *Id.* at 125. Because the mother's affidavit failed to meet these statutory requirements, we affirmed the superior court's decision to decline to hold a hearing on possible reinstatement. *Id.* at 125-28. In light of our adoption of AS 47.10.089(h)'s substantive standards for a *Rita T.* hearing, the *Lara S.* test for a "good cause showing" appears to be the appropriate test for a *Rita T.* hearing. *See id.* at 125.

proved by clear and convincing evidence that it was in Paxton's best interests to be reunited with her. This conforms to the substantive and evidentiary standards we adopted above. But after OCS moved for reconsideration, the court also explained its view that "if circumstances [had] changed so much that the child is no longer a child in need of aid," our case law did not require a best interests analysis and that the child should be reunited automatically with the parent. This latter reasoning was erroneous, but — except as noted below — somewhat immaterial to the disposition of the case, because the initial decision was based on the correct substantive and evidentiary standards. We therefore review OCS's challenges to the court's initial decision, specifically that the court erred by allegedly applying a presumption in favor of reunification and that the court's best interests finding was clearly erroneous.

We start with the general concept of the child's best interests in this context, and we conclude that, just as in a termination trial, the superior court may consider any factor relevant to the child's best interests for possible reinstatement of parental rights.[101] The dispute here is whether, or to what extent, the court may consider the previously described legislative preference for keeping families together. OCS maintains that the court improperly crafted a burden-shifting presumption from this legislative preference,

---

[101]    *See Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 967 (Alaska 2013) (noting we have held "a superior court may consider 'any fact relating to the best interests of the child in its best-interests analysis' " and "the superior court need not accord a particular weight to any given factor" (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 932 (Alaska 2012))); *see also Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008) (holding lack of permanent placement may be a factor in deciding whether termination would be in the child's best interests); AS 47.10.088(b) (setting out factors to consider when determining child's best interests in context of termination proceedings); AS 47.05.065(4)-(5) (setting out legislative findings regarding attachment and the best interests of child who has been removed from child's home).

and that, once parental rights have been terminated, there should be no presumption or preference in the parent's favor. Dara maintains that the public policy and legislative purpose we identified in *Rita T.*, and that are still articulated in AS 47.05.060 and AS 47.10.005, are, subject to the child's best interests, still applicable in the reinstatement context.

We agree with Dara that the public policy and legislative preference we identified in *Rita T.* have some application in the reinstatement hearing context. We disagree with OCS that a prior termination of parental rights means the superior court should pretend there is no family relationship. But the 1990 amendment to AS 47.05.060 and the 2005 amendment to AS 47.10.005 also make clear that the legislative preference for keeping a child with a parent is subject to the child's best interests. In this context the court may be required to evaluate the family relationship and the child's best interests on at least three different levels. Are there reasons specific to the child and family why it would be in the child's best interests to return to the family?[102] Are there reasons specific to the child and family why it would not be in the child's best interests to return to the family?[103] Are there specific countervailing reasons in the child's best interests not to return to the family despite the legislative preference? Every case will be decided on its own facts, always based on the child's best interests.

Although here the superior court first described the legislative preference as a presumption, after OCS moved for reconsideration the court explained it had not

___

[102]     *Cf.* AS 47.10.080(w) (providing courts shall recognize presumption that it is in child's best interests to maintain sibling relationship).

[103]     *Cf.* AS 47.05.060 (providing for child's removal from home when "the child's welfare or safety" cannot be adequately safeguarded).

treated the legislative preference as a burden-shifting presumption, but rather as a preference, and it had held Dara to her burden of proof. We therefore see no legal error in the court's stated use of the legislative preference.

OCS also argues that the superior court clearly erred in its best interests finding. OCS points to the court's few supporting findings and contends that nothing explains why the court ultimately determined that it was in Paxton's best interests to be uprooted from Scarlet's care and returned to Dara. Dara responds that the court's underlying factual findings are sufficient to support the best interests finding, especially given the court's consideration of a wide number of factors.

There was testimony about a variety of factors relevant to Paxton's best interests, for example, Paxton's bond with Scarlet and her husband; Paxton's bond with Dara and his half-sister; Scarlet's wrongful interference with Paxton's visitation with Dara and Scarlet's likely refusal to allow Paxton to have a relationship with his relatives, including his half-sister;[104] Paxton's current medical needs; Paxton's permanency needs and likely harm from removal and reunification with Dara; and the time necessary for transition if reunification were ordered.

Yet the court's best interests findings seem limited in focus to a generalized legislative family preference and Dara's rehabilitation, rather than more specifically to Paxton's best interests:

> 1) The state favors reuniting children with biological parents. 2) Mental illness alone cannot support termination of parental rights. 3) There was no harm caused to the child and it is unlikely harmful conduct will happen. 4) The child's bond with the biological parent can be restored. 5) The child can be returned to the parent within a reasonable time based on

---

[104]    *Cf.* AS 47.10.080(w) (providing courts shall recognize presumption that it is in child's best interests to maintain sibling relationship).

[the] child's age and needs. 6) The parent has put in a great amount of effort to remedy the conduct or conditions in the home.

The court seemingly followed the factors in AS 47.10.088(b),[105] relating to the child's best interests in the involuntary termination context, but it did not expressly consider the legislative findings enumerated in AS 47.05.065(4)-(5),[106] relating to the best interests

---

[105] AS 47.10.088(b) provides:

[T]he court may consider any fact relating to the best interests of the child, including (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent.

[106] AS 47.05.065(4) sets out the legislative finding that the following principles serve a child's best interests after removal from the child's home:

(A) the child should be placed in a safe, secure, and stable environment; (B) the child should not be moved unnecessarily; (C) a planning process should be followed to lead to permanent placement of the child; (D) every effort should be made to encourage psychological attachment between the adult caregiver and the child; (E) frequent, regular, and reasonable visitation with the parent or guardian and family members should be encouraged; and (F) parents and guardians must actively participate in family support services so as to facilitate the child's being able to remain in the home; when children are removed from the home, the parents and guardians must actively participate in family support services to make return of their children to the home possible.

And AS 47.05.065(5) gives credence to studies establishing "it is important . . . to ensure

(continued...)

of a child who has already been removed from the child's own home, as Paxton has been here. These guiding principles place greater emphasis on permanency, the child's age, attachment to caregivers, and regular visitation, among other factors.[107] Such factors go beyond the harm that caused a child to be in need of aid and are highly relevant to determining a child's best interests in the context of reinstating parental rights.

In its reconsideration order the court indicated that it had considered a variety of best interests factors, including "[Paxton's] young age, the length of time he had been out of the home, . . . his attachment to his current placement, [his] bond with [Dara] prior to his removal and his ongoing bond with her exhibited during visitations." This would seem to align with AS 47.05.065(4)-(5). However, despite stating that it had considered these factors, the court did not actually make any additional underlying findings about Paxton's best interests. It may be that the court's decision to limit its best interests findings at this juncture derived from its misunderstanding that a best interests analysis was not necessary.

We are unable to review the superior court's best interests finding absent a more robust set of underlying factual findings. We therefore remand for the court to clarify its findings consistent with this opinion.[108]

---

[106]    (...continued)
that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously."

[107]    *See id.*

[108]    *See, e.g.*, *State, Dep't of Health & Soc. Servs., Office of Children's Servs. v. Michelle P.*, 411 P.3d 576, 584 (Alaska 2018) (remanding because court failed to make best interests findings before releasing child back to parents); *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 954-55 (Alaska 2000) (remanding for additional best interests findings).

## IV. CONCLUSION

We AFFIRM the superior court's original decision terminating Dara's parental rights to Paxton. We REMAND for clarifying findings of fact to support the best interests finding underlying the superior court's subsequent decision reinstating Dara's parental rights to Paxton. The superior court may in its discretion take additional evidence in light of the passage of time and the case's unique circumstances, including the various issues about Paxton's attachments, bondings, and visitation. We retain jurisdiction.

BOLGER, Justice, with whom STOWERS, Chief Justice, joins, dissenting.

I disagree with both the outcome of the court's opinion and the route it takes to get there. In my opinion, the text of AS 47.10.080(f), as amended, can no longer support a procedure for reunification after termination of parental rights. Describing this procedure as a "permanency hearing" is inconsistent with the other statutes that define such a hearing. And the record in this case is simply inadequate to support this extraordinary remedy.

I.      AS 47.10.080(f) No Longer Supports A Procedure For Reinstatement Of Parental Rights Following Termination.

We first inferred that AS 47.10.080(f) permitted review of termination orders in the 1981 case of *Rita T. v. State*.[1]  But this decision was based on a prior version of AS 47.10.080(f). And it relied on a strained reading of this subsection, even as it was worded at that time. When we decided *Rita T.*, AS 47.10.080(f) provided for automatic annual review of disposition orders that placed children under state custody or supervision under AS 47.10.080(c)(1) or (c)(2) and also allowed interested parties to seek such review for good cause.[2]  This subsection did not refer to AS 47.10.080(c)(3),

_____

[1]      623 P.2d 344, 346-47 (Alaska 1981).

[2]      Former AS 47.10.080(f) provided:

A minor found to be delinquent or a child in need of aid is a ward of the state as long as he is committed to the department (of health and social services) or the department has the power to supervise his actions. The court shall review an order made under (b) [a delinquency disposition] or (c)(1) [CINA custody] or (2) [CINA supervision] of this section annually, and may review the order more frequently to determine if continued placement, probation, or supervision, as it is being provided, is in the best interest of the minor and the public. The department, the minor, the

(continued...)

the subsection that allowed the superior court to order termination of parental rights.[3] To overcome this legislative omission, the *Rita T.* court had to read in isolation subsection (f)'s third sentence, which permitted interested parties to seek review of a disposition order for good cause. *Rita T.* thus interpreted this sentence to include review of termination orders under subsection (c)(3) even though subsection (f) did not mention the termination provision. For this interpretation the court relied in part on the purpose of the child in need of aid statute: "to preserve and strengthen the child's family ties whenever possible."[4]

In the years since *Rita T.*, the child in need of aid statute has been substantially revised in ways that further undermine an interpretation of AS 47.10.080(f) that permits review of termination orders.[5] First the purpose of the child in need of aid statute, crucial to *Rita T.*'s holding,[6] was revised in 1990. The statute now aims "to preserve and strengthen the child's family ties *unless efforts to preserve and strengthen*

---

[2]    (...continued)
minor's parents, guardian, or custodian are entitled, when good cause is shown, to a review on application. If the application is granted, the court shall afford these parties and their counsel reasonable notice in advance of the review and hold a hearing where these parties and their counsel shall be afforded an opportunity to be heard. The minor shall be afforded the opportunity to be present at the review.

[3]    AS 47.10.080(c)(3).

[4]    *Rita T.*, 623 P.2d at 346 (citing former AS 47.05.060 (1980)).

[5]    *See* ch. 99, SLA 1998.

[6]    *Rita T.*, 623 P.2d at 346.

*the ties are likely to result in physical or emotional damage to the child*."[7] Additionally, in 1998 the entire chapter on child in need of aid proceedings was substantially revised.[8] The intent of this revision was "to protect children from abuse and neglect" and to "override" several decisions from this court that had erected barriers to termination proceedings.[9] This revision included a new set of legislative findings, including a determination that "it is important to provide for an expeditious placement procedure to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously."[10] The legislature also added a section requiring the child in need of aid statute to "be liberally construed to the end that a child coming within the jurisdiction of the court under this [statute] may receive the care, guidance, treatment, and control that will promote the child's welfare."[11] Another new section redefined all the standards and factors for termination of parental rights.[12]

---

[7]     AS 47.05.060, *as amended by* ch. 29, § 2, SLA 1990 (emphasis added).

[8]     Ch. 99, SLA 1998.

[9]     *Id*. § 1.

[10]    *Id*. § 14.

[11]    *Id*. § 16.

[12]    *Id*. § 33.

In addition to these general revisions, the 1998 revision also substantially amended AS 47.10.080(f) in a manner that further undermined *Rita T.*'s interpretation.[13] The first portion of this subsection now provides that following a custody disposition under subsection (c)(1) there will be an annual permanency hearing, rather than a review hearing, and allows interested parties to request a permanency hearing for good cause.[14] The second portion provides for a review hearing following only a supervision

---

[13]  *Id.* § 26.

[14]  The first seven sentences of this subsection provide:

A child found to be a child in need of aid is a ward of the state while committed to the department or the department has the power to supervise the child's actions. For an order made under (c)(1) of this section [regarding CINA custody], the court shall hold a permanency hearing as required by (*l*) of this section and at least annually thereafter during the continuation of foster care to determine if continued placement, as it is being provided, is in the best interest of the child. The department, the child, and the child's parents, guardian, and guardian ad litem are entitled, when good cause is shown, to a permanency hearing on application. If the application is granted, the court shall afford these persons and their counsel reasonable advance notice and hold a permanency hearing where these persons and their counsel shall be afforded an opportunity to be heard. The persons entitled to notice under AS 47.10.030(b) and the grandparents entitled to notice under AS 47.10.030(d) are entitled to notice of a permanency hearing under this subsection and are also entitled to be heard at the hearing. The child shall be afforded the opportunity to be present and to be heard at the permanency hearing. After the permanency hearing, the court shall make the written findings that are required under (*l*) of this section.

disposition under subsection (c)(2).[15]  In my opinion, this subsection can no longer be read to also permit review of a termination order under subsection (c)(3).

In order to infer a reunification procedure in AS 47.10.080(f), the court's opinion depends on construing a natural parent's reinstatement request as a request for a permanency hearing.  But this construction conflicts with the rules and statutes defining the permanency hearing and outlining the required permanency findings.  For example, AS 47.10.080(*l*)(4) requires the court at the permanency hearing to make findings on "whether the department has made reasonable efforts . . . to offer appropriate support services" to the parents and whether the parents have "made substantial progress to remedy . . . the . . . conditions . . . that made the child in need of aid.[16]  But it would make no sense to continue to require reasonable efforts, support services, and progress on the parent's part after the court has issued an order terminating parental rights.

CINA Rule 17.2 governs permanency hearings and specifically limits the purpose of the permanency hearing to the purpose implied by AS 47.10.080(f):  "to establish a permanency plan for each child committed to state *custody* under AS 47.10.080(c)(1)."[17]  In other words, consistent with the statutory provision on permanency hearings, the CINA permanency hearing rule does not apply to disposition

---

[15]     The last two sentences of this subsection provide:

The court shall review an order made under (c)(2) of this section at least annually to determine if continued supervision, as it is being provided, is in the best interest of the child;  this review is not considered to be a permanency hearing and is not governed by the provisions of this subsection that relate to permanency hearings.

[16]     AS 47.10.080(l)(4)(A), (B).

[17]     CINA Rule 17.2(a) (emphasis added).

orders involving termination under AS 47.10.080(c)(3). CINA Rule 17.2(e) requires permanency hearing findings on "whether the child continues to be a child in need of aid" and "whether the child should be returned to the parent[s]," findings that are unnecessary after a termination order.[18] And CINA Rule 17.2(f) requires findings on whether the department "has made reasonable efforts" (or active efforts in the case of an Indian child) and "whether the parent . . . has made substantial progress to remedy . . . the . . . conditions . . . that made the child in need of aid."[19] Again these required findings are unnecessary after a termination order.

The court's opinion also conflicts with the rules that cut off a natural parent's participation after an order terminating parental rights. CINA Rule 2(k) defines the term "parent" to mean "a biological or adoptive parent whose parental rights have not been terminated." Thus the references to "parent" throughout the CINA rules do not apply to a natural parent whose rights have been terminated under AS 47.10.080(c)(3). And CINA Rule 18(h) establishes a different system (instead of permanency hearings) following a termination order; this rule requires quarterly reports regarding the department's efforts to recruit a permanent placement. But even this rule does not contemplate participation of the natural parent following termination: "Copies of the Department's reports shall not be served on a parent whose rights have been terminated."

The cumulative effect of these rules is to change the focus of the proceeding after an AS 47.10.080(c)(3) termination order. The focus is no longer on reunification; the focus is on finding another permanent placement. Permitting post-termination permanency hearings and allowing natural parents to participate will frustrate this goal.

---

[18]    CINA Rule 17.2(e)(1), (2).

[19]    CINA Rule 17.2(f)(1), (2).

Parental participation will increase the potential for conflict and litigation and increase the potential for delay in achieving permanency.

## II.    Dara Did Not Submit Sufficient Evidence To Support Reunification.

Despite my disagreement with the court's opinion, I have no doubt that the superior court has the inherent power to modify an order terminating parental rights. Alaska Civil Rule 60(b)(5) explicitly allows a court to grant relief from a judgment when "it is no longer equitable that the judgement should have prospective application."[20] But this power should be sparingly exercised. We have quoted with approval from then-Judge Blackmun:

> [M]odification is only cautiously to be granted; . . . some change is not enough; . . . the dangers which the decree was meant to foreclose must almost have disappeared; . . . hardship and oppression, extreme and unexpected, are significant; and . . . the movant's task is to provide close to an unanswerable case. To repeat: caution, substantial change, unforeseenness, oppressive hardship, and a clear showing are the requirements.[21]

Consistent with this caution, at the very least, a parent seeking reunification following a termination order must show, "by clear and convincing evidence . . . that reinstatement of parental rights is in the best interest of the child."[22]

---

[20]    *See, e.g.*, *Cox v. Floreske*, 288 P.3d 1289, 1293 (Alaska 2012).

[21]    *Dewey v. Dewey*, 886 P.2d 623, 627 (Alaska 1994) (alteration and omissions in original) (quoting *Humble Oil & Ref. Co. v. Am. Oil Co.*, 405 F.2d 803, 813 (8th Cir.1969)).

[22]    AS 47.10.089(h) (allowing vacation of a termination order based on a relinquishment of parental rights); *see also* AS 47.10.005, *as amended by* ch. 99, § 16, SLA 1998 (requiring the chapter on child in need of aid proceedings to "be liberally construed to the end that a child coming within the jurisdiction of the court under this

(continued...)

As noted in the court's opinion, the superior court did not make any findings that reinstatement was in Paxton's best interest. The findings directly addressing this issue were inconsistent with reinstatement. For example, the superior court found that "Dr. Sorensen reported that [Paxton] . . . is 'likely' to experience distress if moved"; and that "Dr. Sorensen concludes that the safest result with the least amount of risk to Paxton's emotional well[-]being would be to keep Paxton with [Scarlet]."

These findings are well-supported by the record. Scarlet testified that it would be "extremely difficult" for Paxton to be removed from her home "to be placed with a family that he doesn't really know anymore." Dr. Sorensen thought a change in Paxton's life from living with Scarlet to Dara would be "a highly confusing event for him and one that could very well have a lasting effect" because he would have no memory of living with his mother. Dr. Sorensen believed that Paxton would "have a really hard time for quite some time" before being able to verbalize his concerns, and he "recommended that [Paxton] remain in his current placement . . . indefinitely as a means of maintaining his emotional stability and general safety."

Dara thus failed to submit clear and convincing evidence that reinstatement was in Paxton's best interest. I would reverse and vacate the superior court's decision reinstating Dara's parental rights.

---

[22]      (...continued)
chapter may receive the care, guidance, treatment, and control that will promote the child's welfare").