*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, | ) ) ) | Supreme Court No. S-16527 |
| | ) | Superior Court No. 3AN-13-00386 CN |
| Appellant, | ) | |
| | ) | O P I N I O N |
| v. | ) | |
| | ) | No. 7426 – January 24, 2020 |
| DARA S., | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Pamela Washington, Judge pro tem.

Appearances: Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Kevin G. Clarkson, Attorney General, Juneau, for Appellant. Rachel E. Cella, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for Appellee. Paul F. McDermott, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.

# I.    INTRODUCTION

We recently confirmed that, under some circumstances, a parent whose parental rights have been involuntarily terminated under Alaska's child in need of aid (CINA) statutes may seek post-termination review and reinstatement of parental rights.[1] We explained that a superior court may vacate a termination order if the child has not yet been adopted and the parent demonstrates, "by clear and convincing evidence, that reinstatement of parental rights is in the best interest of the child and that the person is rehabilitated and capable of providing the care and guidance that will serve the moral, emotional, mental, and physical welfare of the child."[2]

In that earlier case, a mother's parental rights to her son had been terminated as a result of her mental health issues.[3] She timely sought review and reinstatement of her parental rights, and the superior court granted review and ultimately granted her reinstatement request.[4] The Office of Children's Services (OCS) and the child's guardian ad litem (GAL) appealed the reinstatement decision, arguing both that post-termination reinstatement of parental rights after an involuntary termination was barred as a matter of law and that the mother had not proved by clear and convincing evidence that reinstatement was in the child's best interests.[5] We rejected the argument

---

[1]    *Dara S. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 426 P.3d 975, 991-99 (Alaska 2018).

[2]    *Id.* at 1000 (emphasis omitted) (quoting AS 47.10.089(h)).

[3]    *Id.* at 983. We affirmed that decision in the appeal. *Id.* at 988.

[4]    *Id.* at 983-87.

[5]    *Id.* at 987.

that reinstatement was barred as a matter of law, but we remanded the case to the superior court for further elucidation of its best interests determination.[6]

The superior court held a post-remand evidentiary hearing and ultimately confirmed its best interests determination. OCS — joined by the GAL — now appeals that determination, arguing that some of the court's underlying factual findings, and therefore its ultimate best interests finding, are clearly erroneous, and that the reinstatement order therefore must be vacated, leaving the parental rights termination in place. As in the prior appeal, there is no dispute about the superior court's determination that the mother met the rehabilitation standard necessary for reinstatement of her parental rights. Because the disputed underlying factual findings supporting the best interests determination either are not material or not clearly erroneous, we conclude that the superior court's reinstatement decision must be affirmed.[7]

## II.    FACTS AND PROCEEDINGS

### A.    Brief Background And Earlier Appeal

Dara S. is the biological mother of Paxton,[8] born February 2011. Paxton was born in Alaska but has lived with Dara's sister and brother-in-law, Scarlet and

---

[6]    *Id*. at 1002.

[7]    Shortly after we heard oral argument in this matter, we issued a summary order affirming the superior court's reinstatement decision, with an explanatory opinion to follow. *State of Alaska, Dep't of Health & Soc. Servs., Office of Children's Servs. v. Dara S., Office of Pub. Advocacy, GAL*, Nos. S-16126/16526/16527 (Alaska Supreme Court Order, Sept. 11, 2019). This is the explanatory opinion.

[8]    We use the same pseudonyms from our earlier opinion for ease of reference and to protect the parties' privacy.

Monty, in Oregon since being placed with them by OCS in April 2014. Dara visited Paxton in July 2014 and decided to stay in Oregon.[9]

In June 2015 the superior court issued an oral decision terminating Dara's parental rights to Paxton, followed by an October 2015 written order.[10] Meanwhile, in September Dara asked for a review hearing, which was held in April and May of 2016.[11] In July the superior court reinstated Dara's parental rights. Following OCS's motion for reconsideration, in October the court clarified its findings and application of the law.

Dara appealed the termination decision; OCS and the GAL challenged the reinstatement decision.[12] We affirmed the superior court's original termination of Dara's parental rights.[13] But the reinstatement decision appeal raised a number of legal issues.[14] We confirmed that reinstatement remains available under Alaska's CINA framework, and we addressed the appropriate substantive and evidentiary standards of proof to apply at a reinstatement hearing.[15] We explained that a superior court shall vacate a termination order if a parent demonstrates, "by clear and convincing evidence, that reinstatement of parental rights is in the best interest of the child and that the person is rehabilitated and capable of providing the care and guidance that will serve the moral,

---

[9] *Dara S.*, 426 P.3d 975 at 980.

[10] *Id.* at 982-83. Other than noting that the underlying reason for the parental rights termination was Dara's mental health issues, *id.* at 988, we will not discuss the termination trial evidence here.

[11] *Id.* at 983, 985.

[12] *Id.* at 983, 987.

[13] *Id.* at 991.

[14] *Id.* at 991-1003.

[15] *Id.* at 991-1000.

emotional, mental, and physical welfare of the child."[16]  We also provided guidance to superior courts regarding factors that should be considered when determining whether reinstatement is in a child's best interests.[17]  We ultimately concluded that the factual findings underlying the superior court's best interests determination were inadequate for our review, and we remanded the case for further proceedings.[18]

**B.     December 2018 Superior Court Proceedings On Remand**

The superior court held an evidentiary hearing over two days in December 2018 to gather more evidence about Paxton's best interests.  Dara testified on her own behalf and had three other witnesses testify:  her mother, Kate; an Oregon social service assistant who had supervised Dara's visits with Paxton; and a licensed clinical social worker.  OCS called four witnesses:  Dara's father, Butch; a clinical psychologist; Paxton's uncle and foster father, Monty; and Dara's OCS caseworker.  The relevant testimony is summarized below.

**1.     Dara's witnesses**

Kate characterized Dara as the "epitome of a good parent."  Kate testified that Dara has maintained steady employment and a safe, clean home in a good neighborhood.  Kate testified that she frequently sees Dara with Georgia and that Kate had attended some of Dara's visits with Paxton; on one occasion Kate heard Georgia discussing a toy she had at home, and Paxton asked when he would get to go there.  Kate also testified that she thought it was in Paxton's best interests to live with Dara, rather

---

[16]     *Id*. at 1000 (emphasis omitted) (quoting AS 47.10.089(h)).

[17]     *Id*. at 1001.

[18]     *Id*. at 1002-03.  In that opinion we carefully outlined the evidence presented to the superior court, *id.* at 983-88, relevant to the court's post-remand decision.  We do not repeat it here.

than Scarlet, because of Dara's "maternal bond" with him and because she was a more "hands-on" parent.

An Oregon social service assistant who supervised some of Dara's visits with Paxton testified about a typical visit between Dara, Georgia, and Paxton. The social service assistant stated that Paxton often lingered at the end of these visits, saying goodbye to Dara repeatedly and seeming reluctant to leave. The social service assistant also testified that on one occasion she heard Paxton tell Dara that he wanted to go home and live with Dara; the social service assistant emphasized that Paxton said this "out of nowhere," with "no prompt," when he and Dara had been "talking about school and life" during a visit.

A licensed clinical social worker who had observed visits between Dara and Paxton testified in support of reunification. The social worker stated that she had observed the family for over 60 hours in the three-and-a-half years she had worked with them; based on those observations, she thought that Dara "is a very attachment-based loving, caring mother." The social worker also testified that she was impressed with how connected Dara, Paxton, and Georgia were, even though they did not get to see each other very often. The social worker described Dara's visits with Paxton as "textbook beautiful visit[s]" and discussed how Dara made sure to tend to her children's needs.

The social worker testified that she disagreed with OCS's expert, clinical psychologist Dr. Erik Sorensen, about whether it would be in Paxton's best interests to be reunited with Dara; the social worker stated that Dr. Sorensen does not understand the deep attachment Paxton already has with Dara. The social worker noted that if Paxton is not reunified with Dara, he may feel a loss from missing out on a childhood with his biological family. The social worker testified that Paxton also may feel resentment and grief as a result and rebel against his foster family. The social worker acknowledged on

cross-examination that she had never observed Paxton with Scarlet and Monty or even spoken to them.

Dara first testified about her job, her college attendance, and her efforts to manage her mental health. She testified that she still attends counseling and that her counselor "helps [her] to build and maintain healthy relationships." She then testified about her efforts to mend relationships with Butch and Scarlet. Dara said she had reached out to Butch and her step-mother and had gone on several small day trips with them and Georgia. Dara also stated that Butch recently had sent her several messages saying that he was proud of her for maturing and that she was doing a good job parenting Georgia.

Dara said her efforts to improve her relationship with Scarlet were unsuccessful. Dara said she had asked Butch to ask Scarlet to go to family counseling, but Scarlet was not interested. Dara stated that when she and Paxton have visits, Scarlet has no contact with Dara and that Scarlet refused to keep a drawing and t-shirt Dara and Georgia gave Paxton. Dara then spoke about her visits with Paxton. She stated that she and Paxton have a "loving and trusting" relationship, that he confides in her during their visits, and that he is attached to Georgia. Dara expressed that she felt ready to raise Paxton and that, despite his health problems,[19] she had no concerns about her ability to get him proper medical attention.

## 2. OCS's witnesses

Butch testified that Dara had made progress since the termination trial, but he disputed her characterization of their relationship. Although Butch acknowledged

---

[19] Paxton was born with serious kidney problems requiring nine surgeries before the age of two. Although his health has since generally improved, he requires a strict diet and frequent medical checkups; he likely will require a kidney transplant by his teenage years. *Id.* at 978.

going on a few outings with Dara and Georgia, he indicated he had not seen Georgia in the past year despite his multiple requests. And Butch testified that despite Dara's progress, overall he thought Paxton was better off with Scarlet and Monty because their home was more stable and because of the possibility of having to seek urgent medical care for Paxton at a hospital a hundred miles away. Butch placed the blame for the breakdown in Dara and Scarlet's relationship on Dara: "[Dara] is the one who burned the bridge . . . if she would show some appreciation that [Scarlet] and [Monty] are raising her child and try to rebuild the bridge that she burned, . . . perhaps she could have a relationship, but she has chosen not to even make any attempt."

Dr. Sorensen testified about his November 2018 evaluation of Paxton. Dr. Sorensen stated that his opinion that it was in Paxton's best interests to remain with Scarlet and Monty had not changed since the earlier reinstatement hearing. Dr. Sorensen testified that reunifying Dara and Paxton would "require severing the primary attachment that he has with his aunt and uncle" and could "result in unnecessary emotional harm and distress." Dr. Sorensen characterized reunification as a "destabilizing influence" and an "adverse event" that could have long-term impacts on Paxton's emotional functioning and anxiety levels. Dr. Sorensen noted that from his observations, Paxton's relationship with Scarlet and Monty looks like a typical parent-child relationship; Paxton calls them "Mom and Dad," and calls Dara by her first name. Dr. Sorensen testified that Paxton had made progress in a number of areas while living with Scarlet and Monty, including overcoming a fear of water and doing better in school.

Dr. Sorensen testified that when he broached the possibility of living with Dara, Paxton expressed confusion and said he could not imagine what that would be like. Dr. Sorensen testified that he tried to attend a visit between Dara and Paxton, but Dara did not want Dr. Sorensen to observe them without first speaking to her attorney; Dr. Sorensen could not reach Dara's attorney, and he left. Dr. Sorensen disagreed with

the social worker's analysis, stating that she appeared to have ignored the "guaranteed harm" that would come from severing Paxton's connection to Scarlet and Monty.

Monty testified about Paxton's life with Monty and Scarlet. Monty said that Paxton shares a room with his four-year-old cousin, whom Paxton views as a brother. Monty described Paxton's progress in school and his activities. Monty was asked about a March 2017 autism evaluation Paxton had. Scarlet and Monty had wanted Paxton evaluated because they felt he had no "empathy"; the evaluators concluded that Paxton was not on the autism spectrum, but they recommended he get treatment for anxiety. Scarlet and Monty did not follow that recommendation.

Monty testified that he currently does not have a relationship with Dara. He was reluctant to agree to having a future relationship with her, stating: "[I]n terms of our relationship with [Dara] and how that looks . . . that would be a very difficult thing to . . . overcome. It's hard to get burned over and over." Monty stated that he and Scarlet had not given consideration to personally arranging visitation between Paxton, Dara, Georgia, and themselves, and he was not sure they were prepared to do that. But Monty testified that he and Scarlet would be willing to continue allowing Dara to have supervised visitation with Paxton. Monty predicted that, if Paxton were reunified with Dara, she would not let Monty and Scarlet see Paxton because they had not been able to see Georgia for some time.

Dara's OCS caseworker testified in favor of Paxton continuing to live with Scarlet and Monty. The caseworker had conducted a home visit with them and observed Paxton interacting with the family. She testified that Paxton appeared to be well-integrated into the family and noted that an outside observer "wouldn't have known that he was not [Scarlet and Monty's] biological child." The caseworker stated that Scarlet and Monty were "doing an amazing job" caring for Paxton's medical needs and that she

was not concerned they had not sought therapy for Paxton following the autism evaluation.

The caseworker also interviewed Paxton during her visit. She reported that Paxton said he enjoyed his visits with Dara, that Dara was his biological mother, and that he had two moms, Dara and Scarlet. When the caseworker asked Paxton where he wanted to live, he seemed confused and stated that he wanted to live with his mom and dad, Scarlet and Monty. The caseworker testified that in her opinion Paxton's bond with Scarlet and Monty was stronger than Paxton's bond with Dara. But the caseworker also acknowledged that she had not observed a visit between Dara and Paxton because Dara had discovered in advance that the caseworker was going to be there, and the caseworker canceled the observation because she thought she would not be able to get an accurate picture. The caseworker testified that — even if Scarlet and Monty were to adopt Paxton — OCS still wanted to ensure Dara could maintain ongoing visitation with Paxton through an intermediary.

The caseworker was cross-examined about OCS's supervision of what was occurring in Oregon. The superior court also questioned her about OCS's approach in this case. The court's questioning reflected concerns with OCS placing restrictions on Dara's and Scarlet's ability to work out problems themselves and with OCS's reliance on quarterly reports about Paxton from Oregon's social services department.

### 3.  January 2019 supplemental findings

The superior court issued clarifying findings in January 2019. The court divided its order into two sections. In the first section, the court made supplemental findings based on the evidence from its original reinstatement hearing. These initial findings focus on the length of time Paxton had been removed from Dara; his bonds with Dara, Georgia, Scarlet, and Monty; and Paxton's physical, medical, and emotional needs. The court noted that, at the time of the initial reinstatement order, Paxton had been in

out-of-home placement for three years; up to that point, he had resided with Dara for a little over two-and-a-half years and with Scarlet and Monty for a little over two years. The court then found that, at the time of the initial reinstatement order, Paxton was still at an age where critical attachments are formed and that the previous "traditional mother[-]child relationship" he had with Dara could be restored. The court found that Paxton had maternal bonds with both Dara and Scarlet and a bond with his biological sister, Georgia. It discounted Dr. Sorensen's contrary testimony regarding Paxton's attachment to Dara, noting that he did not have the opportunity to observe them together. The court then found that Dara was equally capable as Scarlet and Monty of providing for Paxton's physical and medical needs, but the court also found that Scarlet and Monty's hostility toward Dara had caused a rift in the family that could harm Paxton's emotional well-being. The court noted that, in contrast, Dara was open to Paxton continuing a relationship with Scarlet and Monty.

Given that the superior court believed the parties were similarly situated with respect to their bonds with Paxton and their ability to care for him and meet his physical needs, the court concluded that Paxton's emotional well-being was the determinative factor in evaluating his best interests. The court found:

> [Scarlet and Monty] have demonstrated a troubling lack of concern for Paxton's attachments. . . . While the court was watching, while the child was still in state's custody, while their adoption was pending, [Scarlet] exhibited a clear unwillingness to support [Paxton's] emotional well[-]being if it had anything to do with Dara.

In large part because Dara was supportive of Paxton maintaining his bond with Scarlet and Monty, while they were not supportive of Paxton maintaining his bond with Dara, the court concluded that reinstating Dara's parental rights was in Paxton's best interests. The court ended the first section of its findings by stating that the supplemental findings

"make clear that the court's [initial] determination was supported by clear and convincing evidence of the importance of Paxton's . . . emotional well[-]being compared to the other factors."

In the order's second section, the superior court made updated findings based on evidence presented during the December 2018 evidentiary hearing. The court first found that, despite the doctors' recommendations after Scarlet and Monty had Paxton evaluated because they felt he showed no "sympathy, empathy, or remorse," they had failed to seek counseling for his anxiety. In part because of this incident, the court concluded that Scarlet and Monty were "not credible witnesses regarding Paxton's emotional and mental health needs." The court also found that Scarlet and Monty still were unwilling to personally facilitate visitation between Paxton and Dara and had given it "no meaningful consideration"; the court found that this attitude "compromise[d] Paxton's emotional and mental well[-]being." The court found that Dara continued to be open to fostering a better relationship with Scarlet and Monty and engaging in family counseling.

The superior court also summarized Dara's interactions with Paxton at their biweekly visits. The court noted that Dara, Paxton, and Georgia have a "very close and affectionate bond," that Dara was very attentive and affirming at visits, and that Dara set appropriate boundaries and parented Paxton very well under the circumstances. The court concluded that Paxton's connection with Dara "was never broken" and that Dara and Georgia are not strangers to him despite periods of disruption.

The superior court also made findings based on the third-party testimony at the hearing. The court concluded that Dara's OCS caseworker "was unable to offer the court any credible testimony about Paxton's attachment to either [Scarlet and Monty] or Dara," due to the caseworker's negligent supervision of Paxton. The court appeared to discount Dr. Sorensen's testimony because he did not observe Dara and Paxton

together or review Oregon visitation records, and the court believed Dr. Sorensen unquestioningly relied on Scarlet and Monty's "compromised" reporting. The court credited the social worker's opinion that it was in Paxton's best interests to be reunited with Dara, because the social worker was "the only professional that has spoken about the elephant in the room of this case: the open hostility from Paxton's uncle and aunt towards Dara."

> The court then focused its findings on Paxton:

> Paxton wants to be home with his mother and sister. He knows them and is attached to them. Paxton's return home will give him the sense of identity that can only come from honoring his attachment to his mother. . . . Paxton will not be moved unnecessarily; his move is necessary for his emotional well[-]being, which is of paramount importance in an analysis of his best interest.

The superior court ended its order by determining that Paxton's emotional well-being was still the decisive factor in its analysis. The court stated that its "updated findings further support placement with Dara" because "[p]lacing Paxton with [Scarlet and Monty] will lead to a loss of Paxton's bond with Dara and Georgia" while "[r]einstating Dara's parental rights will allow Paxton to maintain connections with everyone."

## III. STANDARD OF REVIEW

Whether reinstatement is in a child's best interests is a factual finding that we review for clear error.[20] "When reviewing factual findings we 'ordinarily will not overturn a trial court's finding based on conflicting evidence,' and will not re-weigh evidence 'when the record provides clear support for the trial court's ruling.' "[21]

---

[20]    *See id.* at 1001.

[21]    *Id.* at 989 (first quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003); then quoting *D.M. v. State,* (continued...)

-13-                                                                    **7426**

"[A]ppellate review of trial court rulings based on testimonial credibility must give 'due regard to the opportunity of the trial court to judge the credibility of the witnesses.' "[22] A finding is clearly erroneous if we are "left with a definite and firm conviction that a mistake has been made after review of the entire record."[23]

## IV.    DISCUSSION

### A.    Compliance With *Dara S.*

We first address whether — contrary to OCS's argument — the superior court complied with our remand directions. We remanded because we concluded that the court had not made sufficient factual findings to support its ultimate finding that reinstatement of Dara's parental rights was in Paxton's best interests.[24] We explained that in the reinstatement context, the court should consider the legislative findings enumerated in AS 47.05.065(4)-(5) for its best interests determination.[25] The court had not done so in its initial reinstatement order or its reconsideration order.[26] We also clarified that Alaska's legislative preference for keeping biological families together has "some application" in the reinstatement context.[27] We noted that courts considering

---

[21]    (...continued)
*Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000)).

[22]    *Harrower v. Harrower*, 71 P.3d 854, 861 (Alaska 2003) (quoting Alaska R. Civ. P. 52(a)).

[23]    *Martin N.*, 79 P.3d at 53.

[24]    *Dara S.*, 426 P.3d at 1002.

[25]    *Id.* and n.106 (setting out legislative findings).

[26]    *Id.*

[27]    *Id.* at 1001-02.

reinstatement should try to evaluate a child's best interests "on at least three different levels" by asking:

> Are there reasons specific to the child and family why it would be in the child's best interests to return to the family? Are there reasons specific to the child and family why it would not be in the child's best interests to return to the family? Are there specific countervailing reasons in the child's best interests not to return to the family despite the legislative preference?[28]

A review of the superior court's supplemental order indicates that it complied with our directions on remand.[29] The supplemental findings referenced the three questions posed in *Dara S.* and the legislative findings in AS 47.05.065(4)-(5). Considering AS 47.05.065(4)-(5), the court made findings about: (1) Paxton's age; (2) his attachment to caregivers; (3) his potential opportunities to maintain visitation with those to whom he is bonded; (4) the safety, security, and stability of Scarlet and Monty's home and Dara's home; and (5) the necessity of moving Paxton from his current placement.

OCS argues that the superior court erred by focusing on Dara's best interests, not Paxton's. OCS contends that the court was over-reliant on the social worker's testimony and report. OCS argues that the social worker's report focuses on Dara's progress, rather than Paxton and his potential response to a transition away from Scarlet and Monty. We reject OCS's characterization. The social worker's report does include information about Dara's progress and the safety and stability of her home, but it also discusses Dara and Paxton's connection and his "healthy" attachment to and love for her. The social worker elaborated on their connection during her testimony.

---

[28] *Id.* at 1001 (footnotes omitted).

[29] *See id.* at 1002.

Contrary to OCS's argument, the superior court focused on Paxton's best interests, and not on Dara's best interests, in its remand decision.

### B. Factual Findings Underlying The Best Interests Determination

OCS argues that some factual findings underlying the superior court's best interests finding are clearly erroneous, and OCS implicitly concludes that these errors mean the best interests finding is clearly erroneous as well.

#### 1. Prior family relationship

OCS contends the superior court clearly erred when it originally found that Paxton lived the first three years of his life in a "traditional mother-child relationship" with Dara. OCS argues that the record shows Dara had a "chaotic life" when Paxton was in her custody for only two-and-a-half years, including her several hospitalizations due to mental health crises and a suicide attempt. OCS challenges "the court's assessment that Paxton would be returning to a home that he knew and loved." In doing so OCS seems to challenge the court's original determination that Paxton's bonds with Dara and Scarlet were equivalent. OCS notes that Paxton "does not include Dara in his description of his family, and his time with Dara was before 'the period of his awareness.' "

It was not clearly erroneous to find that Dara and Scarlet were similarly situated with respect to their bonds with Paxton at the time of the initial reinstatement order. Paxton then had spent approximately the same amount of his life with Dara as he had with Scarlet and was still in what the legislature deemed a "critical attachment" period.[30] Because over two years passed between the initial reinstatement order and the superior court's supplemental findings, Dara and Scarlet may no longer have been similarly situated with respect to their bonds with Paxton. The court made no updated finding about Paxton's relative bonds with Dara and Scarlet. The court instead merely

---

[30] *See* AS 47.05.065(5)(A).

concluded that Paxton's "bond with his mother and sister remains intact" and "was never broken."

But Paxton did not need to be equally bonded with Dara and Scarlet for the superior court to find that reinstating Dara's parental rights was in his best interests. The court could have found that, despite Scarlet's alleged comparatively stronger bond with Paxton, reuniting him and Dara was in his best interests because of Dara's superior ability to care for his emotional well-being and to help him maintain bonds with all of his family members.[31] Any error is thus harmless because the court most heavily weighed Paxton's emotional well-being in its best interests determination, namely his ability to maintain *all* familial bonds.

### 2. Accounting for the passage of time

OCS also argues that the superior court erred by making findings based on the status quo at the time of the reinstatement trial. OCS argues that the first section of the court's order "minimized the extent of Paxton's relationship with Scarlet and Monty by stating Paxton's age at the time of events long past." OCS points to several examples in the order's first section where the court determined Paxton's age and measured the passage of time as of the reinstatement trial. But the court complied with our *Dara S.* opinion by making findings based in part on its original reinstatement order. It might have been problematic had the court ended its supplemental findings there because of the passage of time since the court's first evaluation of Paxton's best interests. But, in

---

[31] *See Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 967 (Alaska 2013) ("We have held that 'a superior court may consider "any fact relating to the best interests of the child" in its best-interests analysis,' and that the superior court need not accord a particular weight to any given factor." (footnotes omitted) (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 932 (Alaska 2012))).

addition to clarifying its earlier findings, the court held an additional evidentiary hearing and made additional findings based on new developments. We see no error.

### 3.     Paxton's emotional well-being

OCS asserts that it was clearly erroneous to find Scarlet and Monty were not able to provide for Paxton's emotional well-being because they refused to facilitate visitation with Dara. OCS contends that Dara had no right to post-termination visitation and that Scarlet and Monty were under no obligation to facilitate it. But the lack of legal obligation to maintain a relationship with Dara did not preclude the superior court from finding that Scarlet and Monty's past — and present — unwillingness to personally facilitate Paxton's relationship with Dara was contrary to Paxton's best interests. The court was concerned about Scarlet and Monty's future unwillingness to personally facilitate Paxton's relationship with Dara; its concern was about Scarlet and Monty's judgment and ability to support Paxton's emotional needs, not legal requirements for visitation. The court did not clearly err when it found that maintaining familial bonds was in Paxton's best interests and that Scarlet and Monty's apparent reluctance to help do that was not.

OCS also argues that the superior court erred by discounting Dr. Sorensen's testimony because he had not recently observed Paxton and Dara together, but failing to do the same with the social worker's testimony because she had not observed Paxton with Scarlet and Monty. OCS points out that Dr. Sorensen had observed a visit between Dara and Paxton in March 2016, and it asserts that Dara and her attorney denied Dr. Sorensen access when he tried to observe her with Paxton prior to the December 2018 evidentiary hearing.

OCS's argument ignores differences in the duration and types of observations made by Dr. Sorensen and the social worker. Dr. Sorensen evaluated Paxton twice. During the first evaluation, Dr. Sorensen observed Paxton with Dara and

interviewed Paxton, Scarlet, and Monty. During the second evaluation, Dr. Sorensen interviewed only Paxton, Scarlet, and Monty. In contrast to Dr. Sorensen's more limited contact, the social worker testified that she had spent at least 60 hours with Dara, Paxton, and Georgia in the 3.5 years the social worker had been involved in the case, and she had spent at least 8 hours observing visits between Dara and Paxton in the 6 weeks prior to the December 2018 evidentiary hearing. The court's findings reflect its legitimate concern about Dr. Sorensen's comparative lack of familiarity with the parties.

We further reject OCS's argument because the superior court also discounted Dr. Sorensen's opinion for failing to take into account "the ongoing animosity [Scarlet and Monty] have with Dara." As previously noted, the court considered Paxton's emotional well-being "the predominant and decisive factor" in its best interests analysis, and it determined that Scarlet and Monty's animosity towards Dara was contrary to Paxton's best interests.

We see no legal error, and the superior court's findings are not clearly erroneous.

### 4. Paxton's choice

OCS argues that the record does not support the superior court's finding that Paxton wants to live with Dara. But there is support in the record. The Oregon social service assistant who supervised some of Dara's visits with Paxton testified that she heard him say he wanted to live with Dara. OCS points out that the only two times Paxton was asked directly if he wanted to live with Dara, by Dr. Sorensen and the OCS caseworker, Paxton expressed a desire to continue living with Scarlet and Monty. But the superior court was entitled to, and did, discount the credibility of both Dr. Sorensen and the caseworker. It is not our role to reweigh the evidence or make new credibility

determinations.[32] Because there is some support in the record for the court's finding, we conclude there was no clear error.

### 5.    Negligent supervision

OCS contends that the superior court clearly erred by finding OCS negligently supervised Paxton while he was in Scarlet and Monty's care. OCS's possible negligence is relevant to the best interests determination only to the extent it explains why the court discounted the caseworker's opinion. Regardless whether OCS was *negligent*, the court was entitled to find that the caseworker's contact with Paxton, Dara, Scarlet, and Monty was insufficient to allow the caseworker to offer an informed opinion on the situation. We cannot say the court's credibility determination was clearly erroneous.

### 6.    Summary

Based on the foregoing discussion, we conclude that none of OCS's challenges to the superior court's underlying findings have sufficient merit to undercut the court's ultimate best interests finding.

## V.    CONCLUSION

We AFFIRM the superior court's decision.

---

[32]    *See supra* notes 21 and 22 and accompanying text.